# Illinois Official Reports

## Appellate Court

---

### *People v. Evans*, 2017 IL App (4th) 140672

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES EVANS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0672 |
| Filed | March 9, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 13-CF-393; the Hon. Craig H. DeArmond, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Jacqueline L. Bullard and Mariah K. Shaver (argued), of State Appellate Defender's Office, of Springfield, for appellant.<br><br>David J. Robinson and John M. Zimmerman (argued), of State's Attorneys Appellate Prosecutor's Office, of Springfield, for the People. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Justices Harris and Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Charles Evans, appeals his conviction, arguing the trial court erred by denying his pretrial motion to quash arrest and suppress evidence. On appeal, defendant argues he was unlawfully stopped by law enforcement and subjected to an unconstitutional search and the trial court erred by not suppressing the fruits of the search. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        In April 2014, a jury convicted defendant of possession of a controlled substance (cocaine) (720 ILCS 570/402(c) (West 2012)) and possession of drug paraphernalia (720 ILCS 600/3.5(a) (West 2012)). In July 2014, the trial court sentenced defendant to 30 months of probation. On appeal, defendant only challenges the trial court's denial of his "motion to quash arrest and suppress evidence." We limit our recitation of the facts to those relevant to the motion.

¶ 4        At approximately 1:54 a.m. on July 27, 2013, defendant was walking in the 300 block of Porter Street in Danville, Illinois. Officer Kyle Harrold of the Danville police department was dispatched to a possible burglary at 314 Porter Street. Officer Harrold was the first to arrive on the scene and noticed defendant walking down the street. Seeing defendant, Officer Harrold turned his squad car around, parked, and exited the vehicle. Officer Harrold approached defendant and asked whether defendant had seen anyone running in the area. Defendant denied seeing anything and stated he just left a friend's house down the block. Officer Harrold knew defendant's friend and knew the friend trafficked narcotics out of his house. During the course of this conversation, defendant placed his hands in the pockets of his shorts. Officer Harrold asked defendant to remove his hands, which defendant did, but defendant immediately placed his hands back in his pockets. Officer Harrold again asked defendant to remove his hands from his pockets, and defendant complied but placed his hands back in his pockets. This cycle occurred several times throughout the remainder of the conversation, and defendant ultimately asked Officer Harrold why he needed to remove his hands from his pockets. At that point, Officer Harrold informed defendant he was going to pat defendant down for weapons, and Officer Harrold conducted a frisk.

¶ 5        During the frisk, Officer Harrold felt what he knew to be a smoking pipe in one of defendant's pockets. Officer Harrold knew the object was a smoking pipe because of his experience with the Vermilion County metropolitan enforcement group, which is responsible for investigating narcotics crimes. Officer Harrold placed defendant in handcuffs at that point and told defendant he was under arrest for the drug paraphernalia in his pocket. Officer Harrold then removed the smoking pipe from defendant's pocket and began to reach into defendant's other pocket, at which point defendant began struggling in an attempt to prevent Officer Harrold from searching the other pocket. Officer Harrold radioed for backup, and the struggle continued until Officer Jon Stonewall arrived. The two officers were then able to subdue defendant and search his pocket. The search revealed a small Baggie containing a hard, rock-like substance. Officer Harrold field tested the substance and concluded it was cocaine. A state chemist later confirmed the substance was cocaine. Defendant was charged by information with possession of a controlled substance and possession of drug paraphernalia.

¶ 6        Defendant filed a pretrial "motion to quash arrest and suppress evidence." The motion alleged Officer Harrold lacked reasonable suspicion to stop defendant and therefore did not

have a right to search defendant. Defendant argued the evidence obtained from the search should be suppressed.

¶ 7 At the hearing on the motion to suppress, Officer Harrold testified he approached defendant for the purpose of determining whether he was involved in the burglary or saw any possible suspects or other suspicious activity. Officer Harrold asked where defendant was coming from, to which defendant responded he just left his friend's house down the block. During the conversation, defendant placed his hands in his pockets, and Officer Harrold asked him to remove them several times. When asked, defendant would remove his hands and then place them back into his pockets. Officer Harrold testified he was concerned for his safety because he was alone with defendant and defendant was much larger than he was. Officer Harrold testified he did not know whether defendant was armed, but his concern grew after defendant refused to keep his hands visible during the conversation. Officer Harrold testified he knew the area was a high-narcotics-crime area, and in his experience, those involved with narcotics were often armed with a firearm. Officer Harrold specifically testified the reason he frisked defendant was to determine whether defendant had a weapon in his pocket.

¶ 8 The trial court concluded the search was a permissible *Terry* frisk because a "reasonably prudent person when [f]aced with these circumstances could have believed his safety was in danger." See *Terry v. Ohio*, 392 U.S. 1 (1968). The court stated the following factors supported Officer Harrold's reasonable belief his safety was in danger: (1) the late hour, (2) the size difference, (3) defendant's refusal to keep his hands visible, (4) the character of the neighborhood, (5) the fact Officer Harrold was alone and responding to a possible burglary, and (6) Officer Harrold's subjective concern for his safety. The court specifically found the initial encounter was consensual and defendant was not a burglary suspect at the time Officer Harrold approached him. Rather, Officer Harrold was merely attempting to gather information relating to the possible burglary in the area. The court denied defendant's motion.

¶ 9 The case proceeded to trial, and defendant was convicted of unlawful possession of a controlled substance and unlawful possession of drug paraphernalia and sentenced to 30 months of probation. This appeal followed.

¶ 10 II. ANALYSIS

¶ 11 On appeal, defendant argues the trial court erred by denying his "motion to quash arrest and suppress evidence." Defendant asserts his constitutional rights were violated because he was unlawfully searched and, therefore, the items seized during the search should have been suppressed.

¶ 12 A. Titling and Tendering the Motion To Quash Arrest and Suppress Evidence

¶ 13 At the outset, we must comment on defendant's pretrial "motion to quash arrest and suppress evidence." "This title is improper because defendant is not challenging his arrest as void but challenging whether the arresting officer had probable cause or reasonable suspicion. A proper title for such a motion is 'motion to suppress evidence.' " *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 22, 66 N.E.3d 601 (citing *People v. Hansen*, 2012 IL App (4th) 110603, ¶ 63, 968 N.E.2d 164 ("defendants should stop filing such motions and should instead file only motions to suppress evidence")). Since deciding *Hansen*, we have repeatedly reiterated the impropriety of titling motions to suppress evidence as "motions to quash arrest" and indicated defense counsel should cease filing such motions. *Id.* ¶¶ 24-27 (citing several

cases reiterating the *Hansen* decision). Noting the lack of success in our effort to make this message clear, we recently called upon trial courts to *sua sponte* reject such motions and "give the counsel who filed the inappropriate motion the opportunity to file a proper motion to suppress under section 114-12 of the [Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/114-12 (West 2014))]." *Id.* ¶ 30. We disapprove of filing meaningless motions to "quash arrest" when the goal is to suppress evidence, and we again call upon trial courts to *sua sponte* reject such motions on their face.

¶ 14                        B. Standard of Review and Burden of Proof

¶ 15        "[W]e review a trial court's ruling on a motion to suppress under a two-part standard: the trial court's factual findings will be reversed only if they are against the manifest weight of the evidence, but the trial court's ultimate ruling on whether suppression is warranted is reviewed *de novo*. [Citation.]" *People v. Chambers*, 2016 IL 117911, ¶ 76, 47 N.E.3d 545. On a motion to suppress, defendant carries the burden of proving the search and seizure were unlawful. *People v. Price*, 2011 IL App (4th) 110272, ¶ 17, 962 N.E.2d 1035. " 'The burden of producing evidence, or the burden of production, rests with the defendant.' [Citation.] ' "However, once the defendant makes a *prima facie* showing of an illegal search and seizure, the burden shifts to the State to produce evidence justifying the intrusion." ' [Citation.]" *Id.*

¶ 16                             C. Police-Citizen Encounters

¶ 17        The United States Constitution and the Illinois Constitution of 1970 protect citizens from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. We interpret article I, section 6, of the Illinois Constitution of 1970 in lockstep with the fourth amendment of the United States Constitution for search and seizure purposes. *People v. Fitzpatrick*, 2013 IL 113449, ¶ 15, 986 N.E.2d 1163. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness *** is determined by assessing, on the one hand, the degree to which [police action] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." (Internal quotation marks omitted.) *People v. Cregan*, 2011 IL App (4th) 100477, ¶ 21, 961 N.E.2d 92 (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001)).

> "It is well settled that not every encounter between the police and a private citizen results in a seizure. [Citations.] Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests. [Citations.]" *People v. Luedemann*, 222 Ill. 2d 530, 544, 857 N.E.2d 187, 196 (2006).

A third-tier encounter is commonly referred to as a "consensual encounter" and does not involve a seizure. *Id.*

¶ 18        In its ruling, the trial court referred to the initial encounter between Officer Harrold and defendant as "community caretaking." Both the State and defendant agree this case does not involve a community caretaking issue. See *id.* at 548, 857 N.E.2d at 198-99 ("[T]he 'community caretaking' doctrine is analytically distinct from consensual encounters and is invoked to validate a search or seizure as reasonable under the fourth amendment. It is not relevant to determining whether police conduct amounted to a seizure in the first place."). In

- 4 -

our opinion, the court merely misspoke when referring to the encounter as a community caretaking encounter. See *id.* at 544-45, 857 N.E.2d at 196-97 (noting the long history of incorrectly referring to a consensual encounter as community caretaking). We will proceed with considering whether the initial encounter was a consensual encounter or *Terry* stop.

¶ 19                                    D. Seizure

¶ 20     Defendant argues he was seized at the moment Officer Harrold began speaking to him, or in the alternative, when Officer Harrold first requested he remove his hands from his pockets. The State responds the initial encounter was consensual, and a seizure did not occur until Officer Harrold frisked defendant. According to Officer Harrold's testimony, the encounter began when Officer Harrold saw defendant walking in the vicinity of the reported burglary and Officer Harrold turned his squad car around, parked, and exited the vehicle. When he approached defendant, he explained to defendant he was investigating a call and wanted to know whether defendant had seen anyone running in the area.

¶ 21     In support of his first argument, defendant relies on a statement by the trial court calling the initial stop an "investigatory stop." *Terry* stops are often called "investigatory stops." However, the context of the court's ruling shows the court did not use the term in that sense; rather, the court meant Officer Harrold was attempting to gather information about the possible burglary, *i.e.*, Officer Harrold was investigating a possible crime. The court specifically concluded the initial encounter was not an "investigatory stop" in the sense defendant uses the term because the court concluded the initial encounter was not a *Terry* stop. This difference in meaning is crucial because a *Terry* stop requires a seizure, and the court's conclusion the initial encounter was not a *Terry* stop indicates the initial encounter did not result in a seizure. Fourth amendment protections are not triggered until a search or seizure occurs. The central inquiry of our analysis is at what point was defendant seized.

¶ 22     "We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980); see also *People v. Murray*, 137 Ill. 2d 382, 390, 560 N.E.2d 309, 131 (1990), *abrogated by Luedemann*, 222 Ill. 2d at 548, 857 N.E.2d at 198-99. (*Murray* adopted the *Mendenhall* standard and *Luedemann* abrogated *Murray* on unrelated grounds.) Defendant appears to confuse the standard for determining whether a person is seized by citing both *Mendenhall* and *Florida v. Bostick*, 501 U.S. 429 (1991). Our supreme court explained *Mendenhall* and *Bostick* provide different standards applicable to different situations. *Luedemann*, 222 Ill. 2d at 550, 857 N.E.2d at 200. To determine which standard applies, the inquiry is whether the individual's movement is restrained by something independent of police action. *Id.* For example, where a person is seated on a bus or in a parked vehicle when confronted by police, the individual's movement is restrained by the enclosure in which the individual is seated, which is independent of police action. *Id.* The *Bostick* standard applies where such an independent restraint on movement is shown, and *Mendenhall* applies where no independent restraint is shown. *Id.* Here, defendant was walking down the street when his encounter with the police began; thus, *Mendenhall* applies, and the standard under *Bostick* is inapplicable. See *id.* (stating the *Mendenhall* standard is appropriate "when the person is walking down a street or through an airport lobby").

¶ 23    Under *Mendenhall*, the proper inquiry is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554.

> "To assist in determining whether a reasonable person believes he or she is not free to leave, courts use the following four indicators, commonly known as the *Mendenhall* factors: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *People v. Lake*, 2015 IL App (4th) 130072, ¶ 37, 28 N.E.3d 1036 (citing *Mendenhall*, 446 U.S. at 554).

"[T]hose factors are not exhaustive and *** a seizure can be found on the basis of other coercive police behavior that is similar to the *Mendenhall* factors." *Luedemann*, 222 Ill. 2d at 557, 857 N.E.2d at 203.

¶ 24    Defendant compares this case to *People v. Thomas*, 198 Ill. 2d 103, 759 N.E.2d 899 (2001), and *People v. Smith*, 331 Ill. App. 3d 1049, 780 N.E.2d 707 (2002). In *Thomas*, a police officer attempted to stop the defendant, who was riding a bicycle, by pulling his squad car into the defendant's path for the purpose of conducting a "field interview" with the defendant regarding the defendant's purported involvement in drug trafficking. *Thomas*, 198 Ill. 2d at 106, 759 N.E.2d at 901. The defendant evaded the police officer's attempt to stop him and was later stopped by means of force. *Id.* at 106-07. The court determined the police officer's attempted roadblock would have been a seizure if the defendant had submitted to the show of authority. *Id.* at 112, 759 N.E.2d at 904. Defendant here attempts to liken Officer Harrold's turning his squad car around, parking the car, exiting his car, and approaching defendant to the attempted roadblock in *Thomas*. These circumstances are not similar. No facts in the record indicate Officer Harrold attempted to block defendant's path or prevent him from continuing on his way. If this were the case, the burden of proving such facts would have been on defendant. See *Price*, 2011 IL App (4th) 110272, ¶ 17, 962 N.E.2d 1035. The record suggests Officer Harrold saw defendant walking in the vicinity of a possible crime and Officer Harrold peaceably approached defendant to speak to him.

¶ 25    In *Smith*, the defendant was standing in front of a "known drug house" when officers approached the defendant to ask what he was doing. *Smith*, 331 Ill. App. 3d at 1051, 780 N.E.2d at 709. The defendant responded he was waiting for his cousin and nervously looked around. *Id.* The officers asked the defendant what was in his pockets, but the defendant refused to answer. *Id.* The officers asked the defendant to remove his hands from his pockets, but the defendant began backing away from the officers. *Id.* At that point, the officers demanded the defendant stop and remove his hands, but the defendant did not comply with the requests. *Id.* The officers then grabbed defendant, forced him to the ground, and placed him under arrest. *Id.* One of the officers testified he had no idea what might have been in the defendant's pockets, and the officer did not testify he feared for his safety. *Id.* at 1051, 780 N.E.2d at 710.

¶ 26    Notably, the court in *Smith* determined no seizure occurred during the initial encounter. *Id.* at 1052, 780 N.E.2d at 710. The court observed: " 'There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.' " *Id.* at 1053, 780 N.E.2d at 710 (quoting *Terry*, 392 U.S. at 34 (White, J., concurring)). In *dicta*, the court indicated a seizure could have occurred when officers told the defendant to "stop and to remove his hands from his pockets" after the defendant had stopped answering the officers'

questions and had begun to back away. *Id.* at 1053, 780 N.E.2d at 711. However, because the defendant did not comply with the officers' requests to stop and remove his hands from his pockets, the seizure did not occur until defendant was forcibly restrained. *Id.*

¶ 27  Like *Smith*, we conclude the initial encounter here was a consensual encounter. None of the *Mendenhall* factors were present, and nothing indicated defendant did not feel free to leave. Indeed, "a seizure does not occur simply because a law enforcement officer approaches an individual and puts questions to that person if he or she is willing to listen. [Citations.]" *People v. Gherna*, 203 Ill. 2d 165, 178, 784 N.E.2d 799, 807 (2003). We reject defendant's assertion a seizure occurred the moment Officer Harrold approached defendant.

¶ 28  Defendant next argues he was seized at the moment Officer Harrold first requested he remove his hands from his pockets. According to Officer Harrold's testimony, defendant placed his hands in his pockets during the conversation, and Officer Harrold asked defendant to remove them. Defendant complied but then placed his hands right back in his pockets, and Officer Harrold again asked him to remove his hands. This pattern continued for a couple of minutes while Officer Harrold and defendant spoke. This case differs from *Smith*, with respect to the seizure issue, in one key aspect: at the point the officers in *Smith* asked the defendant to remove his hands, the defendant had indicated he wished to terminate the encounter by refusing to answer further questions and backing away in an attempt to leave. Here, defendant continued to consent to the conversation with Officer Harrold even after Officer Harrold asked defendant to remove his hands from his pockets several times and never indicated an intent to terminate the conversation prior to being frisked. Thus, we conclude the facts in *Smith* are not instructive on the question of whether defendant was seized when Officer Harrold asked defendant to remove his hands from his pockets.

¶ 29  Under *Mendenhall*, the proper inquiry is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. The only relevant *Mendenhall* factor is the fourth: "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Lake*, 2015 IL App (4th) 130072, ¶ 37, 28 N.E.3d 1036. However, "assertion of authority [absent a physical show of force] by police does not constitute seizure unless defendant submits" to the assertion of authority. *Smith*, 331 Ill. App. 3d at 1054, 780 N.E.2d at 711 (citing *California v. Hodari D.*, 499 U.S. 621 (1991)).

¶ 30  Officer Harrold's repeated requests clearly indicated he wanted defendant to keep his hands visible during their conversation. The fact defendant continued to place his hands back into his pockets shows defendant did not fully submit to Officer Harrold's request. Defendant did not appear to believe compliance with Officer Harrold's request was compulsory because he did not comply with Officer Harrold's obvious wish. Defendant opines the repeated requests he remove his hands from his pockets may have signaled he was suspected of wrongdoing, thus impacting his willingness to continue the encounter. However, the record contradicts this assertion. Defendant's willingness to continue the conversation is evidenced by the fact he continued speaking to Officer Harrold even after Officer Harrold asked him several times to remove his hands from his pockets. Further, the nature of the conversation indicated defendant was not a suspect or even a witness to the possible crime Officer Harrold was investigating.

¶ 31  We recognize defendant's argument Officer Harrold's request for defendant to remove his hands from his pockets was a show of authority. Even if the request was a show of authority,

defendant resisted the authority by continuing to place his hands back into his pockets. Further, the central question remains whether a reasonable person would have felt free to terminate the encounter. The request for defendant to keep his hands visible did not prevent him from exercising his right to terminate the encounter, and a reasonable person in his place should not have believed that right had been extinguished by the request. The touchstone of the fourth amendment is reasonableness, and the request to keep one's hands visible is not an unreasonable restraint of liberty. It merely serves as a protection to both officer and citizen. We reject defendant's argument he was seized when Officer Harrold requested he remove his hands from his pockets and conclude defendant was not seized until Officer Harrold frisked him.

¶ 32                           E. *Terry* Frisk During a Consensual Encounter

¶ 33     In *Terry*, the United States Supreme Court addressed the standard by which we assess second-tier encounters. Pursuant to *Terry*, officers are justified in conducting brief investigatory seizures upon reasonable suspicion the individual is involved in criminal activity. *Terry*, 392 U.S. at 10. Additionally, the officer may conduct an investigatory frisk for weapons upon reasonable suspicion the individual is armed and dangerous. *Id.* The Illinois General Assembly codified these rules in sections 107-14 and 108-1.01 of the Criminal Procedure Code. 725 ILCS 5/107-14, 108-1.01 (West 2014). In *Terry*, the Court reasoned:

> "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

See also *People v. Close*, 238 Ill. 2d 497, 939 N.E.2d 463 (2010) (recognizing *Terry* is the appropriate standard for applying sections 107-14 and 108-1.01 of the Criminal Procedure Code).

¶ 34     Though *Terry* sets forth a clear standard for assessing an officer's actions when the officer approaches a citizen *after* developing reasonable suspicion (1) of criminal activity *and* (2) the citizen is armed and dangerous, it is less clear what standard applies when an officer initiates a consensual encounter and then develops reasonable suspicion the citizen is armed and potentially dangerous. We find our supreme court's decision in *People v. Colyar*, 2013 IL 111835, 996 N.E.2d 575, instructive.

¶ 35     In *Colyar*, police officers observed a car parked at a motel entrance for an unusual amount of time and approached the vehicle to ask the driver why he was parked there. *Id.* ¶¶ 6-7. While speaking with the driver, the officers observed, in plain view, a large bullet in the center console. *Id.* ¶ 8. After observing the bullet, the officers ordered the passengers out of the car and frisked the passengers for weapons. *Id.* ¶¶ 9-10. The State argued:

> "[W]hat began as a neutral encounter escalated when the officers observed the bullet in plain view in the center console of defendant's vehicle. Reasonably suspecting that defendant or his passengers were armed and presently dangerous and that criminal activity may be afoot, the officers were permitted under *Terry* and [*Michigan v. Long*, 463 U.S. 1032 (1983),] to detain defendant and his passengers and perform protective searches of their persons and areas of the car that would provide immediate access to a weapon." *Id.* ¶ 28.

The defendant conceded the initial interaction was justified, but he argued the frisk was unconstitutional because possession of a bullet is not *per se* illegal; therefore, no reasonable suspicion of criminal activity supported the *Terry* frisk. *Id.* ¶¶ 29-30.

¶ 36    While considering the propriety of the search, the *Colyar* majority observed:

> "Here, the record demonstrates that [the officers] were in a vulnerable situation when they observed the bullet. It was dusk and the officers were on foot in a parking lot away from their vehicle. The two officers, who had not drawn their weapons, were also outnumbered by defendant and his two passengers, who were in a running car. Finally, the officers had only a brief exchange with defendant prior to their observation of the plain-view bullet. In other words, the officers were forced to make a quick decision based on limited information after seeing the bullet." *Id.* ¶ 42.

"Reviewing the actions of [the officers] under an objective standard, we believe that a reasonably cautious individual in a similar situation could reasonably suspect the presence of a gun, thus implicating officer safety, based on the bullet clearly visible in defendant's center console." *Id.* ¶ 43. The court observed "when an officer has a reasonable suspicion during an investigatory stop that the individual may be armed and dangerous, the officer is permitted to take necessary measures to determine whether the person is armed and to neutralize any threat of physical harm. [Citation.]" *Id.* ¶ 45. Thus, the court concluded the officers' decision to pat down the passengers of the car was objectively reasonable and did not offend the fourth amendment. *Id.*

¶ 37    The *Colyar* decision is significant because the original encounter between the officers and the citizens began as a consensual encounter but escalated into a permissible *Terry* frisk after the police officers, during the consensual encounter, developed reasonable suspicion the citizens may be armed and dangerous. By rejecting the defendant's argument the police officers lacked reasonable suspicion of criminal activity, the supreme court's decision indicates police officers need not have reasonable suspicion of criminal activity to conduct a *Terry* frisk for weapons during a consensual encounter but, rather, need only have reasonable suspicion the citizen is armed and potentially dangerous.

¶ 38    Justice Thomas supports this position in his special concurrence. *Id.* ¶ 74 (Thomas, J., specially concurring) (" 'If the officer has commenced a nonseizure confrontation without a pre-existing reasonable suspicion supporting a frisk, but such suspicion suddenly appears (most likely because of the suspect's conduct), then the officer is entitled to frisk for his own protection.' " (quoting 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 843 (5th ed. 2012)).

¶ 39    Justice Thomas also notes a federal circuit split on the question of whether a reasonable suspicion criminal activity is afoot *and* the citizen is armed and dangerous must predicate a lawful *Terry* frisk for weapons during a consensual encounter. *Id.* ¶ 71. Justice Thomas observed "this is actually a hotly contested issue in the federal courts." *Id.* Some circuits require reasonable suspicion (1) of criminal activity *and* (2) the individual is armed and dangerous, but other circuits only require reasonable suspicion the individual is armed and dangerous to predicate a *Terry* frisk for weapons. *Id.*; compare *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000), and *United States v. Gray*, 213 F.3d 998 (8th Cir. 2000) (holding all *Terry* frisks must be predicated by reasonable suspicion (1) of criminal activity *and* (2) the individual is armed and dangerous), with *United States v. Romain*, 393 F.3d 63, 75-76 (1st Cir. 2004), *United States v. Orman*, 486 F.3d 1170, 1176-77 (9th Cir. 2007), and *United States v. Bonds*, 829 F.2d 1072, 1075 (11th Cir. 1987) (holding a *Terry* frisk during a consensual

encounter need only be predicated by reasonable suspicion the individual is armed and dangerous).

¶ 40 Justice Thomas further outlined the reasons courts allow police officers to conduct a *Terry* frisk during a consensual encounter upon developing reasonable suspicion the citizen is armed and potentially dangerous.

> "The principal reasons several courts have upheld the right to frisk for weapons during consensual encounters were thoroughly spelled out by Justice Baldock in his dissent in *United States v. House*, 463 Fed. App'x 783, 793 (10th Cir. 2012) (Baldock, J., dissenting): first, 'the strong governmental interest in officer safety is present even in consensual encounters'; second, 'requiring reasonable suspicion of criminal activity would hamstring officers' ability to investigate suspicious behavior'; and third, 'requiring reasonable suspicion of criminal activity before a frisk would prevent officers from taking "reasonable steps to ensure their safety" during consensual encounters.' [Citation.] Moreover, the reason that Justices Burke and Freeman are forced to rely on Justice Harlan's special concurrence in *Terry* is that the Supreme Court in *Terry* did not limit the right to search for weapons only to those cases in which the police have a reasonable suspicion of criminal activity. Rather, the *Terry* majority held that the rules for protective frisks 'will have to be developed in the concrete factual circumstances of individual cases.' [Citation.]" (Emphasis omitted.) *Colyar*, 2013 IL 111835, ¶ 71, 996 N.E.2d 575 (Thomas, J., specially concurring).

Based upon the foregoing, we conclude a police officer may conduct a *Terry* frisk during a consensual encounter upon developing reasonable suspicion the citizen is armed and dangerous; the officer need not develop reasonable suspicion of criminal activity. In such cases, the seizure and frisk will occur contemporaneously because a consensual encounter is, by definition, not a seizure. Accordingly, a police officer must have reasonable suspicion the individual is armed and dangerous at the time of the frisk. By so concluding, we note defendant's arguments relating to the lack of reasonable suspicion defendant was involved in criminal activity are inapplicable.

¶ 41                                              F. Reasonable Suspicion

¶ 42 A *Terry* frisk during a consensual encounter must be predicated by reasonable suspicion the individual is armed with a weapon and, therefore, presently dangerous. See *id.* ¶¶ 34-37. To develop reasonable suspicion, the officer must have more than an "inarticulate hunch"; the officer must "point to specific and articulable facts which, taken together with rational inferences from those facts" demonstrate the suspicion is reasonable. (Internal quotation marks omitted.) *Id.* ¶ 40.

> " '[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' When reviewing the reasonableness of an officer's conduct, it is appropriate to give due weight to 'the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience.' [Citation.]" *Id.* ¶ 36 (quoting *Terry*, 392 U.S. at 27).

"[W]e apply an objective standard to decide whether the facts available to the officer at the time of the incident would lead an individual of reasonable caution to believe that the action was appropriate." *Id.* ¶ 40.

¶ 43     We agree with the trial court's conclusion Officer Harrold had reasonable suspicion defendant was armed. Officer Harrold testified to the following facts. Officer Harrold was alone with defendant at a late hour in an area Officer Harrold knew was a high-narcotics-crime area. Officer Harrold was substantially smaller than defendant. Defendant informed Officer Harrold he was coming from a house Officer Harrold knew, through his work as a police officer, belonged to a person who trafficked narcotics, and in Officer Harrold's experience, individuals who deal with narcotics are often armed with a weapon. Officer Harrold was concerned for his safety because of the size difference, and he did not know whether defendant had a gun or knife in his pocket. Defendant acted peculiarly by continually placing his hands in his pockets, even after Officer Harrold asked him to remove his hands from his pockets several times throughout the conversation, and defendant ultimately refused to remove his hands and asked why he needed to. Defendant argues because he was wearing basketball shorts made of a slick, cloth material, any weapon in his pocket should be visible and obvious. We are not persuaded by this argument because a small weapon might be easily concealed in such a pocket. Taking all the factors together, it was objectively reasonable for Officer Harrold to suspect defendant may have been armed with a weapon.

¶ 44     Defendant cites *People v. Anderson*, 304 Ill. App. 3d 454, 463, 711 N.E.2d 24, 30 (1999), for the proposition placing something in one's pocket does not give rise to reasonable suspicion. Defendant also cites *People v. Walker*, 2013 IL App (4th) 120118, ¶ 46, 995 N.E.2d 351, which held the officers lacked reasonable suspicion based on the mere fact the defendant appeared nervous about the contents of her purse and attempted to grab it from the officers. The officers in *Walker* also admitted in their testimony part of the reason they wished to search defendant's purse was to discover what defendant appeared to be hiding in the purse. *Id.* ¶¶ 39-40, 51. Defendant cites many other cases concluding factors such as the lateness of the hour, anxious behavior, and character of the neighborhood, without more, cannot establish reasonable suspicion. See, *e.g.*, *People v. Linley*, 388 Ill. App. 3d 747, 753, 903 N.E.2d 791, 798 (2009); see also *People v. Davis*, 352 Ill. App. 3d 576, 580-83, 815 N.E.2d 92, 97-99 (2004) (discussing several cases considering whether reasonable suspicion was properly developed). The *Davis* court cited *People v. Dotson*, 37 Ill. App. 3d 176, 345 N.E.2d 721 (1976), to conclude the simple fact an individual attempts to put his hands in his pockets does not necessarily create reasonable suspicion the individual is armed or dangerous. *Davis*, 352 Ill. App. 3d at 581, 815 N.E.2d at 98. The *Dotson* court determined many innocuous reasons explain placing one's hands in one's pockets, such as the desire to keep warm. *Dotson*, 37 Ill. App. 3d at 177, 345 N.E.2d at 722.

¶ 45     These cases are similar to one another because they discuss certain factors which, when taken alone, do not give rise to reasonable suspicion an individual is armed with a weapon. However, the basis for reasonable suspicion must be assessed upon the *totality of the circumstances* in the instant case. See *Terry*, 392 U.S. at 29. Defendant misses the mark by forgetting these factors may still be considered together with other factors to render an officer's suspicion objectively reasonable. Officer Harrold did not decide to frisk defendant based solely on one fact alone; he decided to frisk defendant based on the quantum of facts he learned while speaking to defendant, coupled with defendant's refusal to keep his hands visible.

¶ 46     Additionally, defendant mischaracterizes Officer Harrold's testimony by stating Officer Harrold never testified he suspected defendant was armed and dangerous. At the hearing on the

motion to suppress, Officer Harrold testified he was concerned for his safety because of the size difference between him and defendant, and he continuously stated he did not know whether defendant was armed, which was the reason he decided to frisk defendant. Though he may not have used the exact terminology or "magic words," we conclude Officer Harrold's testimony established the fact he suspected defendant might have been armed and dangerous.

¶ 47 In sum, we conclude the totality of the circumstances known to Officer Harrold at the time of the frisk warranted the reasonable suspicion defendant was armed and thus dangerous, thereby permitting Officer Harrold to conduct a *Terry* frisk.

¶ 48 G. Scope of the Search

¶ 49 On appeal, defendant argues Officer Harrold exceeded the scope of a permissible *Terry* frisk. The State responds defendant forfeited the issue. To preserve an issue for appeal, "the record must show that (1) a contemporaneous objection to the trial court's error was made, *and* (2) the issue was contained in a written posttrial motion." (Emphasis in original.) *People v. Rathbone*, 345 Ill. App. 3d 305, 308-09, 802 N.E.2d 333, 336 (2003) (citing *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988)). In defendant's pretrial motion to suppress evidence, defendant argued Officer Harrold lacked reasonable suspicion defendant was involved in criminal activity and was armed and dangerous. Defendant did not assert the frisk exceeded the scope permitted by *Terry*. Defendant's posttrial motion for a new trial also alleges Officer Harrold did not have reasonable suspicion defendant was involved in criminal activity and he "did not have a right to search defendant" pursuant to *Terry*. Again, the posttrial motion lacked any reference to the scope of the frisk. We agree with the State's assertion this forfeiture is significant because the record is completely devoid of evidence relating to the manner in which the frisk was conducted. We also note the burden to produce evidence the frisk exceeded the scope of a permissible *Terry* frisk was on defendant, and defendant failed to meet that burden. We conclude defendant has forfeited any argument relating to the scope of the frisk.

¶ 50 III. CONCLUSION

¶ 51 For the reasons stated, we affirm defendant's conviction. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002 (West 2014).

¶ 52 Affirmed.