# Illinois Official Reports

## Appellate Court

---

### *In re Elijah W.*, 2017 IL App (1st) 162648

---

| | |
|---|---|
| Appellate Court Caption | *In re* ELIJAH W., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Elijah W., a Minor, Respondent-Appellant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-16-2648 |
| Filed | March 10, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-JD-1099; the Hon. William G. Gamboney, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Daniel T. Mallon, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Bryan Chinwuba, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion.<br>Presiding Justice Hoffman and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1     Respondent, Elijah W., a 13-year-old minor, was charged as a juvenile with two counts of possession of a controlled substance. Both counts were based on illegal drugs which Chicago police officers confiscated from Elijah's person. Elijah filed a motion to quash his arrest and suppress evidence, alleging he was seized without probable cause or a reasonable, articulable suspicion of criminal activity and without a valid search or arrest warrant. Elijah sought suppression of the drugs seized as a result of the alleged illegal arrest and seizure. The trial court denied Elijah's motion. Following an adjudication hearing, the court adjudicated Elijah delinquent of both counts of possession of a controlled substance and sentenced him to one year of intensive probation. Elijah appeals the denial of his motion to suppress and seeks to vacate his adjudication. We affirm.

¶ 2                                     BACKGROUND

¶ 3     At the hearing on the motion to suppress, Elijah testified that on May 14, 2016, at about 11 p.m., he stood outside talking to some friends when he saw an unmarked police car turn around the corner toward them. Elijah told his friends to disperse. He began to walk on the sidewalk south on Monticello Avenue toward Augusta Boulevard. The driver of the police vehicle did not activate the emergency lights, siren, or spotlight. After initially passing Elijah, the police vehicle drove in reverse toward him. He turned and started to walk north toward Thomas Street. At that point, the police officer driving the vehicle told Elijah to "come here." The officer did not yell at Elijah, pull a weapon from his holster, or shine a spotlight on Elijah. All of the officers in the police vehicle wore plain clothes and bulletproof vests with visible badges. Elijah walked toward the vehicle because he felt obligated to listen to the police.

¶ 4     When he reached the police vehicle, the driver told him to "[g]ive me the weed" and grabbed him underneath his right shoulder. Elijah repeatedly denied possessing any marijuana. The officer told Elijah that only 30 minutes remained on his shift and that if he told the officers "what you got on you, we won't lock you up." Elijah responded, "So if I tell you what I have on me, you won't lock me up?" Two other police officers then exited the vehicle and handcuffed Elijah. He told the officers to look for the drugs in the change pocket of his jeans and in the left pocket of the jogging pants which he wore underneath his jeans.

¶ 5     Chicago police officer Meeks testified that on the day in question, he was on routine patrol in a high narcotics area with officers Acevedo, McCarthy, and Garcia. The officers wore plain clothes and drove in an unmarked sport utility vehicle. Officer Acevedo drove the vehicle and Officer Meeks sat directly behind him. Each officer was armed, wore a bulletproof vest, and displayed a police badge. The patrol car turned the corner from Augusta Boulevard onto Monticello Avenue at about 10 miles per hour and started to "creep down the street" at a slower speed. The emergency lights and the spotlight were not activated.

¶ 6     Officer Meeks first observed Elijah standing on the west side of Monticello Avenue. One other person stood with Elijah at the time. Three of the officers recognized Elijah. At that point, Officer Acevedo attempted to conduct a field interview. When the vehicle rolled by Elijah, he looked at the officers and started to walk southbound on Monticello. Officer Acevedo put the police vehicle in reverse and slowly backed up toward Elijah, who then turned and attempted to walk northbound. Officer Acevedo stopped the vehicle and called Elijah to come over to the car. Elijah was nearly parallel with the police vehicle at that time. Parked cars

separated the police vehicle from Elijah. All the windows of the police vehicle were rolled down. Officer Acevedo twice called to Elijah to "come here" in a casual but stern tone of voice. The other officers remained in the vehicle. None of the officers unholstered their weapons or pointed them at Elijah. Officer Acevedo did not shine the vehicle's spotlight on Elijah.

¶ 7 Elijah complied and walked toward the police vehicle. Officer Acevedo asked Elijah "what he was doing out there." Elijah shrugged in response. Officer Acevedo repeated his question in a stern tone. Elijah then responded, "I got a couple rocks on me." Officer Meeks exited the police vehicle and placed Elijah in handcuffs. He searched a small change pocket on Elijah's jeans and found six ziplock bags containing suspect crack cocaine. Officer Meeks also searched the jogging pants Elijah wore underneath his jeans and found another plastic bag containing 12 ziplock bags with capsules of suspect heroin in the right pocket.

¶ 8 On cross-examination, Officer Meeks testified that Elijah was free to walk away while Officer Acevedo conducted the field interview. As they first approached, Elijah walked a few feet away from the police vehicle and then initially stopped on his own. Elijah also hesitated before approaching the police vehicle. Officer Meeks stated that when Officer Acevedo called to Elijah for the second time, he use a stern tone but did not yell at him. Officer Meeks did not recall Officer Acevedo reaching out of the window to grab Elijah.

¶ 9 Following this testimony, the trial court took judicial notice there was an existing warrant on Elijah at the time in question. Both parties stipulated that, despite the warrant, the original police report indicated that he had no active warrants. The trial court stated that under Illinois law, "the police can arrest [a suspect] even if that particular officer doesn't know that there's an arrest warrant." The court found Officer Meeks's testimony more credible than Elijah's testimony. The court found Elijah demonstrated at the time the police approached him that he did not want to speak to the officer seeking to conduct a field interview:

> "As to whether or not there was a field interview or a *Terry* stop or outside of any kind of curfew violation or a prior warrant, it's a difficult question as to whether the *Mendenhall* factors have been fulfilled or whether this 13-year-old who is told multiple times to come to the car, a 13-year-old was without his consent."

¶ 10 The court found the police had a justifiable reason to stop Elijah simply for violating curfew. Because Elijah blurted out, "I've got a couple rocks on me," the police officers no longer needed to conduct a field interview. In addition, the court found that under the imputed knowledge doctrine and the objective standard doctrine, Elijah's arrest would have been justified due to the outstanding warrant. The court denied Elijah's motion to suppress.

¶ 11 After an adjudication hearing, the trial court found Elijah delinquent of both counts of possession of a controlled substance and sentenced him to one year of intensive probation. This appeal followed.

¶ 12 ANALYSIS

¶ 13 Elijah argues that the trial court erred when it denied his motion to quash arrest and suppress evidence. He contends the police improperly seized him when Officer Acevedo told him "come here" and that the seizure exceeded the scope permitted under *Terry v. Ohio*, 392 U.S. 1 (1968), because the police lacked a reasonable, articulable suspicion that he was committing a crime. Elijah also argues that his outstanding warrant did not operate as an

intervening circumstance that would justify the seizure because the police were unaware of the warrant before his arrest.

¶ 14     The State contends that Officer Acevedo interviewed Elijah on a consensual basis, having never seized or detained him until he voluntarily admitted that he possessed illegal drugs. The State argues that even if the conversation between Officer Acevedo and Elijah was not consensual, Elijah was in violation of the Chicago curfew ordinance, which provided the police with a reasonable, articulable suspicion to stop and question him.

¶ 15                                    Standard of Review

¶ 16     A reviewing court applies a two-part standard of review to a trial court's ruling on a motion to quash arrest and suppress evidence. *People v. Hopkins*, 235 Ill. 2d 453, 471 (2009). We defer to a trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Id.* However, a reviewing court is free to undertake its own assessment of the facts in relation to the issues presented and draw its own conclusions in deciding what relief, if any, should be granted. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). We review *de novo* the trial court's ultimate legal ruling on a motion to suppress. *Id.*

¶ 17     The United States and Illinois Constitutions guarantee citizens the right against unreasonable searches and seizures. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 12. However, our supreme court has recognized three types of police-citizen encounters that do not constitute an unreasonable seizure: (1) arrests, which must be supported by probable cause; (2) a brief investigative stop, also known as a *Terry* stop; and (3) encounters that do not involve coercion or detention and therefore do not implicate fourth amendment interests. *Luedemann*, 222 Ill. 2d at 544.

¶ 18                                    Consensual Encounter

¶ 19     This case concerns both the consensual encounter of a minor and a *Terry* stop. We address the consensual encounter first.

¶ 20     Not every encounter an individual has with law enforcement triggers fourth amendment scrutiny. *Terry*, 392 U.S. at 19 n.16. Consensual encounters do not trigger such scrutiny. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Unlike a *Terry* stop, consensual encounters require no reasonable, articulable suspicion that the person has committed or is about to commit a crime. *People v. Gherna*, 203 Ill. 2d 165, 177 (2003). The United States Supreme Court and our supreme court have made it clear that a detention does not occur simply because a police officer approaches an individual to ask a few questions. *Bostick*, 501 U.S. at 434; *Gherna*, 203 Ill. 2d at 178. As long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual, and no reasonable, articulable suspicion is required on the part of the officer. *California v. Hodari D.*, 499 U.S. 621, 628 (1991). Only when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty does a seizure occur. *Bostick*, 501 U.S. at 434; *Gherna*, 203 Ill. 2d at 177-78.

¶ 21     There is no bright-line rule to determine if an encounter is consensual. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). "[I]n order to determine whether a particular encounter constitutes a

seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439; see also *Gherna*, 203 Ill. 2d at 178. Whether or not a person would have believed that he or she was free to leave is to be evaluated in light of the totality of the circumstances, rather than emphasizing the particular details of that conduct in isolation. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *Gherna*, 203 Ill. 2d at 178. "Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573.

¶ 22    Factors that might indicate an unlawful detention has taken place include (1) the threatening presence of several police officers, (2) an officer's display of a weapon, (3) some physical touching of the person, or (4) the use of language or a tone of voice indicating that compliance with the officer's request might be compelled. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Luedemann*, 222 Ill. 2d at 553. Application of the *Mendenhall* factors "hinges on an objective evaluation of the police conduct and not upon the subjective perception of the individual approached." *Gherna*, 203 Ill. 2d at 178; see also *Mendenhall*, 446 U.S. at 554.

¶ 23    The State relies on three cases to support its contention that the police officers never seized Elijah before his admission to possessing drugs. However, none of these cases concerned whether a minor consented to police questioning. Instead, each of the State's cases determined whether a reasonable adult in the defendant's position would have felt free to disregard the police and continue on with his business. See *People v. Castigilia*, 394 Ill. App. 3d 355, 360 (2009) (although the defendant was walking by himself late at night when the police officer addressed him, a reasonable person in the defendant's position would not have perceived the officer's words and actions as a demand for cooperation); *People v. Jackson*, 149 Ill. App. 3d 156, 158 (1986) (concluding a reasonable person innocent of any crime would not have believed he was under arrest at the time the defendant placed a bag of drugs in the officer's view); *People v. Tilden*, 70 Ill. App. 3d 859, 860-61 (1979) (officers requesting the defendant to approach did not constitute a *Terry* stop). We therefore must consider whether a juvenile's age is a factor to be considered in these circumstances.

¶ 24    "A child's age is far 'more than a chronological fact.' " *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). The United States Supreme Court has recognized that "compared to adults, juveniles have a lack of maturity and an underdeveloped sense of responsibility; they are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; and their characters are not as well formed." (Internal quotation marks omitted.) *Graham v. Florida*, 560 U.S. 48, 68 (2010). Recent Supreme Court decisions reflect the recognition of the difference in mental capacity between adults and juveniles. See, *e.g.*, *Miller v. Alabama*, 567 U.S. 460, ___, ___, 132 S. Ct. 2455, 2464, 2468 (2012) ("children are constitutionally different from adults for purposes of sentencing," and "in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult"); *J.D.B.*, 564 U.S. at 265 ("a child's age properly informs the *Miranda* custody analysis").

¶ 25    In *J.D.B.*, the Supreme Court addressed whether the age of a child subjected to police questioning is relevant under *Miranda v. Arizona*, 384 U.S. 436 (1966). *J.D.B.* involved "a

13-year-old, seventh-grade student attending class" who was removed from class and questioned by a uniformed police officer in a closed conference room with another officer and two school administrators present for 30 to 45 minutes. *J.D.B.*, 564 U.S. at 265-66. The minor confessed to a theft after the officer "warned" that he could be put in juvenile detention. The *J.D.B.* Court held that the age of the subject is relevant to the custody analysis of *Miranda*. It remanded the case for the state court to consider the minor's age as one of the relevant factors in determining whether he was in custody when the police interrogated him. *Id.* at 281. Although the *J.D.B.* decision addressed coerced, false confessions from an innocent juvenile, it does not address fourth amendment consensual encounters. The Supreme Court did, however, note that "even where a 'reasonable person' standard *** applies, the common law has reflected the reality that children are not adults." *Id.* at 274.

¶ 26 Our supreme court's decision in *In re D.L.H.*, 2015 IL 117341, adopted the analysis set forth in *J.D.B.* There, the court considered whether the test for determining whether the minor was in custody for purposes of section 5-170(a) of the Juvenile Court Act of 1987 (705 ILCS 405/5-170(a) (West 2012)) was any different than the test for determining whether he was in custody for the purposes of *Miranda*. The court noted two discrete inquiries required under *Miranda*: (1) "what were the circumstances surrounding the interrogation," and (2) "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." (Internal quotation marks omitted.) *D.L.H.*, 2015 IL 117341, ¶ 50. These inquiries were objectively designed " 'to give clear guidance to the police.' " (Internal quotation marks omitted.) *Id.* (quoting *J.D.B.*, 564 U.S. at 271). Our supreme court has identified several factors relevant to the first inquiry, including, among other things, "the age, intelligence, and mental makeup of the accused." *People v. Slater*, 228 Ill. 2d 137, 150 (2008). After consideration of these factors, courts "must make an objective determination as to whether a reasonable person, innocent of wrongdoing, would have believed he or she was free to terminate the questioning and leave." *D.L.H.*, 2015 IL 117341, ¶ 51.

¶ 27 The *D.L.H.* court found that when the person questioned is a juvenile, "the reasonable person standard is modified to take that fact into account." *Id.* (citing *People v. Braggs*, 209 Ill. 2d 492, 508-10 (2003)). The court explained, "If *** we are concerned with what a reasonable person in the defendant's shoes [citation] would have thought about his or her freedom of action, the reasonable person we envision must at least wear comparable footwear." (Internal quotation marks omitted.) *Id.* The court considered the surrounding circumstances and the minor's age, intelligence, and mental makeup, as well as other relevant factors, concluding that the nine-year-old respondent was not in custody when questioned by a police detective. *Id.* ¶¶ 54-56. The decision in *D.L.H.* was limited to fifth amendment *Miranda* concerns and did not extend to fourth amendment consensual encounters involving a minor.

¶ 28 Although Illinois courts have not addressed this issue, the California Court of Appeal, First District, noted that the holding in *J.D.B.* "seems particularly fitting for search-and-seizure analyses since the tests for custody under the Fifth Amendment and detentions under the Fourth Amendment both focus on how reasonable persons would perceive their interaction with the police." *In re J.G.*, 175 Cal. Rptr. 3d 183, 190 (Ct. App. 2014). The court further noted that "extending the holding to search-and-seizure cases would not be much of a stretch because the United States Supreme Court suggested long before it announced *J.D.B.* that a minor's age matters in evaluating whether the minor was seized." *Id.* (citing *Kaupp v. Texas*, 538 U.S. 626,

630-31 (2003)). However, the court did not resolve the issue of whether to extend *J.D.B.*'s holding to fourth amendment custody determinations because it concluded that the minor respondent had been illegally detained regardless of his age. *Id.* at 190-91.

¶ 29    The California Court of Appeal, Fourth District, completed the analysis and applied the *J.D.B.* decision to a fourth amendment determination of whether the minor respondent consented to an encounter with a police officer. See *In re Noah R.*, No. G049514, 2015 WL 691412 (Cal. Ct. App. Feb. 18, 2015) (unpublished order under California Rules of Court Rule 8.1115). There, a police officer investigated a dumpster fire behind a retail store. He encountered the minor respondent on a sidewalk at the far end of the store's parking lot. He asked the minor " 'where he was coming from,' " and the minor responded that he had just come from the "99 Cent store," where he had bought ice cream. *Id.* at *1. The officer told the minor about the dumpster fire and asked him if he had seen anybody in or around the area. The minor said he had not and the conversation ended.

¶ 30    Later, while stopped at a traffic light, the officer saw the same minor standing on a sidewalk. When the minor saw the officer, he immediately turned and walked into the driveway of a housing complex. The officer followed the minor because he saw him at the scene of previous fires. When the minor was 10 yards in front of the officer, he asked the minor if he was the "gentleman" or "kid" with whom he had spoken to earlier at the 99 Cent store. The minor turned around, stopped, and said he was. The officer, who did not have a weapon drawn, asked the minor to approach. The officer again asked the minor whether he knew anything about the fires. The minor answered "no." The officer asked the minor whether he had anything illegal or any matches or lighters. The minor again answered in the negative. The officer asked the minor if he had anything in his backpack, and he again responded, "no." After additional questioning, the minor agreed to open the small front pocket of his backpack, which contained a large box of matches. The officer then detained the minor.

¶ 31    The *Noah R.* court found that the first encounter was consensual, but the second encounter, which began as consensual, transformed into a detention by the end of the encounter. *Id.* at *4. "A reasonable person would not believe he or she could deny the request [to open the backpack]; indeed, had the Minor refused to comply and walked away, his conduct could have been used to justify a detention on the ground he was being evasive." *Id.* at *5. The court further explained, "[i]n particular, a 13 year old, undoubtedly taught in school to respect and obey law enforcement officers, would not feel free to disregard a request made by a uniformed and armed police officer." *Id.* The court stated, "[a]lthough this is a Fourth Amendment case, and not a Fifth Amendment case, the reasoning of *J.D.B.* applies just as forcefully to Fourth Amendment detention analysis." *Id.* (citing *In re J.G.*, 175 Cal. Rptr. 3d at 190). The *Noah R.* court concluded that the minor's consent to search the backpack was the product of a warrantless detention. *Id.*

¶ 32    Likewise, we believe that the holding in *J.D.B.* should apply to a fourth amendment analysis when determining whether an encounter between a minor and law enforcement was consensual. In this case, the trial court addressed the issue of consent and considered Elijah's age when determining "whether this 13-year-old who is told multiple times to come to the car, a 13-year-old was without his consent." Considering all the circumstances surrounding the encounter, we agree with the trial court and find a 13-year-old youth would not have believed he or she could have denied the officer's two requests to "come here" and avoid the police without raising further suspicion. Although the officers drove an unmarked vehicle, Elijah

- 7 -

observed four officers wearing bullet proof vests and visible badges. Officer Acevedo initially passed Elijah and then drove in reverse to approach him. He twice called to Elijah in a stern voice to "come here." We find a 13-year-old under the same circumstances presented would not feel free to disregard the officer's request. We affirm the trial court's finding that Elijah did not consent to the encounter with Officer Acevedo.

¶ 33                                                    *Terry* Stop

¶ 34    Elijah next argues that at the time of the stop, the police lacked the requisite reasonable, articulable suspicion justifying the seizure. He contends the fact that he was located in a high narcotics trafficking area and that three of the officers in the police cruiser recognized him were wholly insufficient to support a *Terry* stop. Elijah argues that Officer Meeks's testimony fails to establish that they stopped him for violating curfew. We disagree.

¶ 35    In *Terry*, the United States Supreme Court held that "an officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch.' " *Gherna*, 203 Ill. 2d at 177 (quoting *Terry*, 392 U.S. at 27). During a *Terry* stop, an officer may temporarily detain an individual for questioning where the officer reasonably believes the individual has committed, or is about to commit, a crime. *Terry*, 392 U.S. at 21-22.

¶ 36    To justify a *Terry* stop, officers must be able to point to specific and articulable facts which, considered with the rational inferences from those facts, make the intrusion reasonable. *Sanders*, 2013 IL App (1st) 102696, ¶ 14; *People v. Rhinehart*, 2011 IL App (1st) 100683, ¶ 14. Although reasonable suspicion is a less stringent standard than probable cause, an officer's hunch or unparticularized suspicion is insufficient. *People v. Lampitok*, 207 Ill. 2d 231, 255 (2003). When determining whether an investigatory stop is reasonable, we rely on an objective standard and view the facts from the perspective of a reasonable officer at the time of the stop. *Sanders*, 2013 IL App (1st) 102696, ¶ 14. A decision to make a *Terry* stop is a practical one based on the totality of the circumstances. *Id.*

¶ 37    Chicago's ordinance defines "curfew hours" for minors (persons under 17 years of age) as follows:

> "(A) For minors 12 through 16 years of age, 10:00 p.m. on any Sunday, Monday, Tuesday, Wednesday, or Thursday until 6:00 a.m. of the following day; and
> \*\*\*
> (C) For minors 12 through 16 years of age, 11:00 p.m. on any Friday or Saturday and until 6:00 a.m. of the following day[.]" Chicago Municipal Code § 8-16-020(a)(1) (amended Apr. 10, 2013).

The ordinance provides that: "A minor commits an offense if he remains in any public place or on the premises of any establishment within the city during curfew hours." Chicago Municipal Code § 8-16-020(b)(1) (amended Apr. 10, 2013).

¶ 38    Under "Enforcement," the ordinance states:

> "Before taking any enforcement action under this section, a police officer shall ask the apparent violator's age and reason for being in the public place. The officer shall not issue a citation or make an arrest under this section unless the officer reasonably believes that an offense has occurred and that, based on any response and other

- 8 -

circumstances, no defense in subsection (c) is present." Chicago Municipal Code § 8-16-020(d) (amended Apr. 10, 2013).

¶ 39 In this case, the totality of the circumstances justified a *Terry* stop. We find Elijah's violation of the curfew ordinance made the intrusion reasonable under *Terry*. Police officers observed 13-year-old Elijah outside after 11 p.m. After Elijah approached the police vehicle, Officer Acevedo specifically asked him "what he was doing out there." Officer Meeks testified that the officers sought to conduct a field interview to "ask him why he was out." Elijah voluntarily responded to Officer Acevedo's question, "I've got a couple rocks on me." The officers then recovered illegal drugs on his person. In sum, the officers reasonably suspected an ordinance violation based on the late hour of the night and Elijah's young appearance. Accordingly, the trial court properly denied Elijah's motion to quash arrest and suppress evidence.

¶ 40 Because we find that Elijah's curfew violation justified the *Terry* stop, we need not consider his argument concerning whether his outstanding warrant justified his search and arrest.

¶ 41 CONCLUSION

¶ 42 We affirm the judgment of the trial court denying respondent's motion to quash the arrest and suppress evidence.

¶ 43 Affirmed.