# Illinois Official Reports

## Appellate Court

---

### *In re Tyreke H.*, 2017 IL App (1st) 170406

---

| | |
|---|---|
| Appellate Court Caption | *In re* TYREKE H., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Tyreke H., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-0406 |
| Filed<br>Rehearing denied | September 28, 2017<br>November 13, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-JD-1793; the Hon. Stuart F. Lubin, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Michael Gentithes, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and Edith Rios, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justice Howse concurred in the judgment and opinion.<br>Justice McBride specially concurred, with opinion. |

**OPINION**

¶ 1     Minor respondent Tyreke H. (Respondent) was riding his bicycle on Waveland Avenue when two police officers, wishing to speak with him not as a suspect but as a potential witness to a homicide, stopped their squad car in Respondent's path of travel in the middle of the street. When stopped, officers spotted a bulge in his pocket that resembled a firearm. Respondent confirmed his identity to the officers and admitted that he was in possession of a firearm. He was adjudicated delinquent of two counts of aggravated unlawful use of a weapon and one count of unlawful possession of firearms.

¶ 2     Respondent claims he was unreasonably seized and unreasonably searched in violation of the fourth amendment. The trial court initially agreed and suppressed the evidence of the gun, then reconsidered and reversed its ruling, leading to Respondent's adjudication of delinquency on the gun charge.

¶ 3     We affirm. We hold that a seizure did take place, but that the seizure was reasonable under the circumstances. We further agree with the trial court that the search did not violate the fourth amendment.

¶ 4     I

¶ 5     On August 11, 2016, the State filed a petition for adjudication of wardship, charging Respondent with two counts of aggravated unlawful use of a weapon (AUUW) and one count of unlawful possession of firearms (UPF). The first AUUW count was premised on Respondent's possession of a gun while he was not in his home, was under 21 years of age, and was not engaged in lawful activities under the Wildlife Code. The other AUUW count was based on Respondent's possession of a handgun when he had not been issued a currently valid Firearm Owner's Identification (FOID) Card. The UPF count was premised on his possession of a concealed handgun while he was under 18 years of age.

¶ 6     Respondent filed a motion to quash arrest and suppress evidence. He claimed the stop, search, and interrogation went beyond the scope of an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). He argued that the officers had no reasonable, articulable belief that he was armed, nor any reasonable articulable suspicion that he was in the process of committing, or was about to commit, any crime.

¶ 7     On September 12, 2016, the trial court held a hearing on Respondent's motion. Officer Gerald Ludwich, a Chicago police officer, testified that, on August 10, 2016, at approximately 1:30 p.m., he was on duty in an unmarked car in the area of 5640 West Waveland with his partner, Officer John Rottman. Both were in plain clothes with vests that displayed a badge and name tag.[1]

¶ 8     The officers were assisting Area North detectives in a homicide investigation. The detectives had asked them to locate Respondent as a possible witness and request that Respondent accompany them to headquarters for questioning about the homicide. The officers had been given a photograph of Respondent and information as to his home location.

¶ 9     While in the area of West Waveland, the officers saw an individual they believed to be Respondent riding a bicycle. Officer Ludwich testified that when he first saw Respondent,

---

[1]Both officers' names were spelled more than one way in the transcript.

there was a bulge in Respondent's right front jeans pocket. He was about 75 feet away at the time.

¶ 10    Both Respondent and the officers were traveling eastbound. The officers drove past Respondent, visually confirmed his identity, and stopped the car just in front of Respondent, just east of him, so that he would ride directly to them. At that point, the distance between Respondent and the officers "was only ten feet possibly," but the distance was decreasing as Respondent continued traveling eastbound towards the officers.

¶ 11    The officers got out of their vehicle as Respondent stopped before them. Officer Rottman, the driver, asked Respondent for his name. Respondent identified himself, cooperated, and made no furtive movements either before or during the stop. Officer Ludwich testified that, after they confirmed that Respondent was Tyreke H., it was Officer Ludwich's intention to ask Respondent some questions and ask whether he was willing to go down to the station.

¶ 12    Officer Ludwich came around the rear of the car and approached Respondent from behind. When he was about four feet away, he saw the bulge in Respondent's pocket. He testified that this bulge appeared "to be basically a handgun in [Respondent's] right front pants pocket." Officer Ludwich also stated that "[i]t was a silhouette of a handgun in a front jeans pocket." Officer Ludwich had recovered a handgun "hundreds" of times during his 23-year career with the Chicago police department. And, in his opinion, the bulge in Respondent's pocket was "different than what a typical wallet or set of keys would look like."

¶ 13    Before conducting a protective pat down of Respondent, Officer Ludwich tapped Respondent's right pant pocket to confirm, for officer safety, whether it was a firearm. Officer Ludwich described what he felt as a "hard metallic nonyielding touch." Based on what he felt when he tapped Respondent's right front pants pocket, Officer Ludwich "believed" and "knew" it was a gun in Respondent's pocket. He said, "What's this?" Respondent replied, "It's a gun. I need it for protection."

¶ 14    Officer Ludwich performed a protective pat down and recovered a .22 caliber AMT semiautomatic handgun with six live rounds, five in the magazine and one in the chamber. Officer Ludwich testified that the gun was approximately seven inches long. The weapon was inventoried, and Respondent was arrested.

¶ 15    At the end of the hearing, the trial court granted Respondent's motion to suppress. The trial court found that Respondent was "in a different position from the usual defendant because the police were not suspicious that there was criminal activity as in the case of *Terry v. Ohio*, [392 U.S. 1 (1968)]." Instead, as the trial court noted, Respondent was a possible witness. In granting Respondent's motion to suppress, the trial court stated, in part, as follows:

> "On cross-examination, [Officer Ludwich] said [the bulge in Respondent's pocket] appeared to be a handgun. It looked like a handgun. It was the silhouette. And he tapped his pocket. He patted him down. He never asked him, you know, You are a witness, would you like to come to the station?
>
> He never gave him a chance to do that. So this is a pretty close case, but I think [Respondent] was searched illegally."

¶ 16    The State moved for reconsideration. The State argued that the court erred in its application of the law, that a police officer is not required to ask questions before recovering a weapon. The State contended that, based on Officer Ludwich's observations of the bulge in Respondent's pocket, which he believed to be a handgun, Officer Ludwich was justified in conducting the pat down to determine if it was, in fact, a handgun.

¶ 17    On October 14, 2016, the court began hearing the motion to reconsider. The trial court looked at the gun and stated that the gun was smaller than the court had previously thought. The court said it "would like to see the gun actually in the pants to decide whether or not—that—that would be the best test of whether it can be—if it's immediately apparent to be a gun." The State's motion was entered and continued.

¶ 18    On November 10, 2016, the trial court held a hearing on the State's motion. Defense counsel noted that although Respondent had provided his pants, the police officers could not determine which pants Respondent was wearing on the date of his arrest. After hearing argument from both sides, the trial court granted the motion to reconsider and reversed its previous suppression order.

¶ 19    At trial, the State presented Officer Ludwich as its only witness. He testified consistently with his prior testimony at the hearing on Respondent's motion to suppress.

¶ 20    Officer Ludwich also testified that, when he recovered the firearm from Respondent, he did not present a valid FOID card. When asked whether Respondent told him that he had a valid FOID card, Officer Ludwich testified: "I believe he said he did not." On cross-examination, Officer Ludwich testified that he did not run Respondent's name in the computer to see if he had a FOID card.

¶ 21    The trial court made a finding of delinquency on all three counts. The court later sentenced Respondent to 18 months' probation. Respondent filed a timely notice of appeal.

¶ 22                                                    II

¶ 23    Respondent raises two issues regarding his encounter with the police officers. He says he was unreasonably *seized* in violation of the fourth amendment, and that he was unreasonably *searched* in violation of the fourth amendment. The seizure and search questions are separate matters, of course. *People v. Sorenson*, 196 Ill. 2d 425, 433 (2001) ("The question of whether the investigatory stop was valid, however, is a separate question from whether the search for weapons was valid."). We consider the seizure question first, because if the initial encounter was an unconstitutional detention, the search incident to that detention was, too. *People v. Harris*, 2011 IL App (1st) 103382, ¶ 17; see also *Adams v. Williams*, 407 U.S. 143, 146 (1972).

¶ 24                                                    A

¶ 25    We apply a two-part standard of review when considering the trial court's ruling on a motion to suppress evidence. *People v. Almond*, 2015 IL 113817, ¶ 55. We afford great deference to the trial court's factual findings, reversing them only if they are against the manifest weight of the evidence. *Id.* We review *de novo* the trial court's ultimate ruling as to whether the evidence should be suppressed. *Id.*

¶ 26    But here, as to the question of the initial stop, there are no disputed facts. Officer Ludwich testified without contradiction as to the circumstances surrounding the stop of

Respondent. Respondent does not claim that the officer's testimony was fabricated or implausible. (The search issue is a different matter, but we are concerned here only with the seizure.) Because the facts are undisputed, we apply *de novo* review to this issue. See *People v. Gherna*, 203 Ill. 2d 165, 175 (2003); *People v. Anthony*, 198 Ill. 2d 194, 201 (2001); *People v. Sims*, 192 Ill. 2d 592, 615 (2000).

¶ 27    Respondent says that the police seized him when they blocked his path, forcing him to stop his bicycle and answer questions, and that they did so without any reasonable, articulable suspicion that Respondent had committed a crime. The State does not dispute the second half of that argument; it agrees that the officers lacked a reasonable, articulable suspicion that Respondent had committed a crime. But the State argues that the trial court properly denied Respondent's motion because he was not seized in the first place; the encounter between the officers and Respondent, says the State, was consensual.

¶ 28    Both the fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Our supreme court has divided police-citizen encounters involving the investigation of crime into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or "*Terry* stops," which must be supported by a reasonable, articulable suspicion that the detainee has committed, is committing, or is about to commit a crime (see *Terry*, 392 U.S. 1); and (3) encounters that involve no coercion or detention, known as consensual encounters. *People v. Hopkins*, 235 Ill. 2d 453, 471 (2009); *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006). And a "consensual encounter between a citizen and an officer does not violate the fourth amendment because it does not involve coercion or a detention." *Almond*, 2015 IL 113817, ¶ 56.

¶ 29    "[A] person has been seized when, considering the totality of the circumstances, a reasonable person would believe he is not free to leave." *Almond*, 2015 IL 113817, ¶ 57. Recently, in *In re Elijah W.*, 2017 IL App (1st) 162648, ¶¶ 27-32, this court held that, when determining whether an encounter between a minor and law enforcement was consensual for fourth amendment purposes, the reasonable person standard is modified to take the minor's age and other relevant factors into account. *Id.* ¶ 27-32. This court reasoned that our supreme court has adopted the holding of the U.S. Supreme Court that an individual's age and other characteristics are relevant in determining whether the individual is in "custody" for purposes of the fifth amendment. See *In re D.L.H.*, 2015 IL 117341, ¶ 51 (in considering "whether a reasonable person, innocent of wrongdoing, would have believed he or she was free to terminate the [police] questioning and leave," "the reasonable person standard is modified to take [fact that person is juvenile] into account"); *J.D.B. v. North Carolina*, 564 U.S. 261, 281 (2011) (juvenile's age must be considered in determining whether juvenile was in "custody" under Fifth Amendment). This court then agreed that the consideration of a juvenile's age on the fifth amendment "custody" question " 'seems particularly fitting for search-and-seizure analyses since the tests for custody under the Fifth Amendment and detentions under the Fourth Amendment both focus on how reasonable persons would perceive their interaction with the police.' " *Elijah W.*, 2017 IL App (1st) 162648, ¶ 28 (quoting *In re J.G.*, 175 Cal. Rptr. 3d 183, 190 (2014)).

¶ 30    We agree with Respondent that the determination of whether he was seized depends on whether, considering the totality of the circumstances, a reasonable 17-year-old would

believe he was not free to leave. But we emphasize that, whether we considered a reasonable person in the abstract or a reasonable 17-year-old, our decision would be the same.

¶ 31    The United States Supreme Court has identified the following four factors that indicate a seizure: (1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) some physical touching of the person, or (4) using language or tone of voice compelling the individual to comply with the officer's requests. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); see also *Almond*, 2015 IL 113817, ¶ 57. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Mendenhall*, 446 U.S. at 555.

¶ 32    The Illinois Supreme Court has stated that "the absence of *Mendenhall* factors, while not necessarily conclusive, is highly instructive." *Luedemann*, 222 Ill. 2d at 554; accord *Almond*, 2015 IL 113817, ¶ 57. "If those factors are absent, that means that only one or two officers approached the defendant, they displayed no weapons, they did not touch the defendant, and they did not use any language or tone of voice indicating that compliance with their requests was compelled." *Luedemann*, 222 Ill. 2d at 554. "Obviously, a seizure is much less likely to be found when officers approach a person in such an inoffensive manner." *Id.* But the *Mendenhall* factors are not exhaustive, and a seizure may be found on the basis of other coercive police conduct similar to the *Mendenhall* factors. *People v. Cosby*, 231 Ill. 2d 262, 281 (2008).

¶ 33    We find instructive the reasoning of the appellate and supreme courts in *People v. Thomas*, 315 Ill. App. 3d 849 (2000), *aff'd*, 198 Ill. 2d 103 (2001).

¶ 34    In *Thomas*, 198 Ill. 2d at 106, an Officer Melton had heard from an informant that the defendant was using his bicycle to deliver illegal drugs. The defendant was riding his bicycle and holding a police scanner when the officer overtook and passed defendant by car and then "positioned his squad car across defendant's path." *Id.* At that point, the defendant abruptly changed direction on his bicycle, escaping down an alley; he was later caught with drugs in his possession. *Id.* at 106-07.

¶ 35    The trial court suppressed the evidence of the drugs, finding that the officer's stopping of the car, blocking the defendant's path, constituted an unreasonable seizure. *Thomas*, 315 Ill. App. 3d at 852. The appellate court agreed that the officer's initial stop of the vehicle constituted a *Terry* stop unsupported by the requisite reasonable, articulable suspicion that the defendant was engaged in criminal activity. The appellate court rejected the State's claim that the initial stopping of the vehicle fell under the third category of police-citizen interaction, the "consensual encounter," elaborating at length on its reasoning:

"Officer Melton was not trying to engage in the kind of personal intercourse between police officers and citizens that falls short of a seizure. He was trying to effect a forceful stop and detention. His use of the phrase "field interview" to describe his intent and design does not alter what he did in order to effect it. Nor does it change the investigative nature of that intent and design.

***

The method employed to fulfill this investigative purpose constituted more than a mere casual approach to engage in conversation. To give effect to his intent, Officer Melton had to chase after and find the defendant. Then he had to halt the defendant's movements. When he caught up to the defendant, he did not honk his horn and wave,

- 6 -

or roll down his window and engage in conversation. *** Officer Melton maneuvered his squad car to effect an abrupt stop of a moving vehicle by cutting off the path ahead. This was clearly an effort to effect an investigatory stop and detention.

Contrary to the State's contention, Officer Melton's actions constituted a show of authority. While it is true that Officer Melton did not display a gun, did not utter a word, and did not physically touch the defendant, his action was sufficient to produce a feeling of freedom's restraint in an objectively reasonable person. Officer Melton sped past the defendant, made a sudden veer at a right angle to the defendant's travel route, and deployed his squad car in a manner designed to cut off the defendant's roadway. It would be quite reasonable for a motorist, or, in this case, a bicyclist, confronted with such police action to conclude that the officer wanted no further movement and expected submission. *When a police officer suddenly obstructs continued movement by placing his squad car between a traveler and the road ahead, most travelers would feel compelled to stop and constrained to stay until they engaged further direction from the officer.*" (Emphasis added.) *Id.* at 853-54.

¶ 36 The appellate court ultimately held, however, that because the defendant did not submit to the unreasonable seizure—he fled down an alley instead—he could not have been "seized" as a matter of law, as *California v. Hodari D.*, 499 U.S. 621, 627 (1991), held that when a suspect flees from an officer's attempt to detain him, no "seizure" can occur under the fourth amendment. *Thomas*, 315 Ill. App. 3d at 857.

¶ 37 Our supreme court "agree[d] with the appellate court that Officer Melton's initial conduct constituted an unwarranted investigatory stop and was constitutionally impermissible." *Thomas*, 198 Ill. 2d at 110. The supreme court concurred in the following summary from the appellate court:

" 'Had the defendant stopped when his path was obstructed, had he submitted to Officer Melton's show of authority, a seizure of the kind offensive to our constitution would have occurred. Officer Melton would have effected an investigatory stop absent the requisite degree of suspicion to support it. The stop would have constituted an unreasonable seizure of the defendant's person. However, Officer Melton's attempt to effect an unlawful stop did not implicate the fourth amendment because the defendant took flight and prevented it.' We agree and so hold." *Id.* at 112 (quoting *Thomas*, 315 Ill. App. 3d at 857).

¶ 38 There are some obvious differences between this case and *Thomas*—Respondent did not flee from the police but submitted to the show of police authority; Respondent was not suspected of criminal wrongdoing—but on the question of whether the officers' actions here constituted a seizure, *Thomas* is squarely applicable.

¶ 39 Here, the officers drove past Respondent on his bicycle and then quickly stopped just short of him, got out of the car, and faced him. Officer Ludwich testified that the vehicle, travelling eastbound like Respondent on his bike, passed Respondent and then "stopped just in front of him," "just east of him." At that point, the officers left the vehicle so "[Respondent] would ride directly to us." When the State, on cross-examination, asked if he or his partner approached Respondent, Ludwich said, "Actually, [Respondent] continued travelling eastbound toward us, which was only ten feet possibly."

¶ 40 A reasonable, innocent person, riding a bike along a public roadway, seeing a vehicle stop "just in front of him" and positioned in his path of travel such that he "would ride

directly to" that car, and then seeing two officers wearing badges on their vests quickly emerge from the vehicle and face him, could only come to one conclusion: "that the officer[s] wanted no further movement and expected submission." *Thomas*, 315 Ill. App. 3d at 854. The only conclusion a reasonable, innocent person could draw from the officers' actions was that they were demanding to speak with him then and there.

¶ 41    As in *Thomas*, we cannot accept the State's contention that what occurred here was a casual, "consensual" encounter not subject to the fourth amendment. This was not a low-key approach on a sidewalk for a consensual chat; Respondent's travel by bicycle was halted in the middle of the road by a vehicle that cut off his path of travel, with two officers immediately emerging from that car to address him.

¶ 42    We acknowledge the general rule that the police do not seize citizens when they approach them in public to ask a question. See *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Luedemann*, 222 Ill. 2d at 549. But there is a difference between approaching a pedestrian on the sidewalk and stopping a bicyclist in mid-travel down the street, by positioning a police vehicle directly in front of the bike's forward path and immediately leaving the car to speak with the oncoming bicyclist. As New York's highest court put it, "[a]lthough the right to stop a vehicle is generally analogous to the right to stop a pedestrian, police/motorist encounters must be distinguished from police/pedestrian encounters," because "the obvious impact of stopping the progress of an automobile is more intrusive than the minimal intrusion involved in stopping a pedestrian." *People v. Spencer*, 646 N.E.2d 785 (N.Y. 1995). Here, Respondent's progress was stopped no less because he was on a bike, rather than behind the wheel of a car.

¶ 43    " '[T]he critical factor is whether the policeman, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens.' " *People v. Lake*, 2015 IL App (4th) 130072, ¶ 29 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 582-83 (5th ed. 2012)). Said differently, "[A]n encounter between a police officer and a civilian 'is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse.' " *People v. Castigilia*, 394 Ill. App. 3d 355, 358 (2009) (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 425 (4th ed. 2004)). Thus, in *Lake*, 2015 IL App (4th) 130072, ¶ 32, when an officer approached the defendant and tapped him on the shoulder, no seizure occurred, as the officer's touch of the shoulder was "one of many nonoffensive methods our culture and society accept as a measure of common courtesy to attract another person's attention" and "was not a demonstration of police authority indicative of a seizure."

¶ 44    A lay person might stop a fellow citizen on the street and ask for directions, or ask them the time, or interact with that citizen for any number of reasons. But a lay person cannot stop a car in the middle of the road and get out, as if in a parking lot, to ask a question of the motorist or bicyclist behind them. That action was an unquestionable show of police authority above and beyond ordinary social intercourse, and it would be perceived as such by any reasonable, innocent person. We are not suggesting that the officers did anything wrong, or that they abused their authority, but neither will we pretend that stopping their car in the middle of the road to speak with an oncoming bicyclist is the same thing as a casual approach of a citizen on the sidewalk. No reasonable, innocent person would have viewed their actions as anything but a show of police authority, indicating that the officers wanted to speak with

- 8 -

Respondent, and they wanted to do so right at that moment. We reject the State's claim that this was a consensual encounter.

¶ 45   Indeed, we highly question whether Respondent even would have had a *chance* to consent, given the officers' testimony that they stopped the car "just in front of him," leaving him little time to have done anything other than stop the bike right in front of them—which was exactly how the officers designed the stop, by Ludwich's own admission.

¶ 46   True, as the State argues, the officers did not draw weapons, tackle him, or threaten Respondent. That was true in *Thomas*, too, but our supreme court still found that the officers' blocking of the defendant's path of travel by bike constituted a seizure. *Thomas*, 198 Ill. 2d at 110, 112; see also *Thomas*, 315 Ill. App. 3d at 854 ("While it is true that Officer Melton did not display a gun, did not utter a word, and did not physically touch the defendant, his action was sufficient to produce a feeling of freedom's restraint in an objectively reasonable person."). As in *Thomas*, the officers' actions were an unquestionable show of authority, designed to indicate to a reasonable, innocent person that he was supposed to stop his bike and submit to that authority.

¶ 47   While, as we already said above, our supreme court has noted that the absence of any of the four traditional *Mendenhall* factors is "highly instructive" (*Luedemann*, 222 Ill. 2d at 554) on the seizure question, neither our supreme court nor the United States Supreme Court has ever instructed us to consider only those factors to the absolute exclusion of any other factual circumstances that may be present in a given case. *Thomas*, itself, is just such an example.

¶ 48   Indeed, the United States Supreme Court, in determining whether the police seized a fleeing suspect, considered whether the officers "operated the car in an aggressive manner to block [the suspect's] course or otherwise control the direction or speed of his movement." *Michigan v. Chesternut*, 486 U.S. 567, 575 (1988). Though the Court there found no seizure, as the police made no attempt to stop the man after he fled on foot upon seeing the police cruiser, but rather merely "drove alongside him for a short distance" before the man discarded contraband (*id.* at 569), the Court considered the vehicle's intrusion on the suspect's movements as a factor in determining whether a seizure occurred.

¶ 49   The Maryland Supreme Court made this very point in *Jones v. State*, 572 A.2d 169, 172 (Md. 1990), in holding that an officer seized a bicyclist when he pulled his police cruiser to the side of the road, got out, and verbally called out to the passing bicyclist: "Hey, could you come here" or "Hold on a minute" or "Hey, wait a minute." The court acknowledged the absence of the four traditional *Mendenhall* factors but noted that *Chesternut* indicated that other factors could be considered as well, including the officer's use of his vehicle to obstruct the citizen's progress and the Maryland court found that a reasonable person in defendant's position would not have felt free to disregard the officer and pedal away. *Id.*

¶ 50   We are not suggesting that the facts of this case entirely mirror those in *Jones*. The vehicle there did not stop directly in front of the bicyclist's forward path or impede its movement at all, but on the other hand, the officer said something to the passing bicyclist that indicated that the officer wanted his attention. Our point here is simply that the manner in which the officers used their vehicle in this case is a factor that we are entitled to consider.

¶ 51   The State also argues that the vehicle in *Thomas* completely blocked the defendant's forward path, unlike here. True, the car in this case was not stopped at an angle, but it stopped in Respondent's direct path of travel and almost immediately in front of him,

- 9 -

whereupon officers got out of the car to face the rapidly-approaching Respondent. Our analysis need not rise or fall on whether Respondent's path was completely, mostly, or partially obstructed. From an objective standpoint of the reasonable, innocent person, the officers had clearly gone to considerable effort to stop Respondent on his bike without advance notice—without first calling out to him and asking him to pull over, or signaling to him in any way before stopping the vehicle right in front of him and in his direct path, then emerging from the car to face him. Any reasonable person would have concluded that the officers were demanding his attention at that very moment.

¶ 52 And we would further note that the vehicle in *Thomas* did not block the defendant's immediate forward path—he had time to steer his bike to avoid the police vehicle, which is precisely what he did, fleeing down an alley on that bike before reaching the roadblock. See *Thomas*, 198 Ill. 2d at 106. Here, in contrast, while the car did not veer to an angle, it stopped almost immediately in front of Respondent. No two cases ever have precisely the same facts in this context. But we do not see how this distinction advanced by the State alters the outcome.

¶ 53 The State is also correct that Respondent cooperated once he was detained; he gave them his name and truthfully admitted he had a gun in his pocket. But the seizure had already occurred by then. The officers' actions are viewed at their inception. See *id.* at 109 ("The conduct constituting the stop under *Terry* must have been justified at its inception."); *People v. Colyar*, 2013 IL 111835, ¶ 40 (same). The fact that Respondent, once seized by police officers, cooperated with the officers does not convert a seizure into a "consensual encounter." We would have very little left of the fourth amendment if an individual's submission to authority *after* being seized could be viewed as some waiver of a constitutional right.

¶ 54 In addition to some differences between *Thomas* and this case we have just discussed above, the special concurrence further distinguishes *Thomas*, arguing at length that the motivations of the officers in *Thomas* were to stop a man they suspected had committed a crime, whereas here, "the only evidence regarding the officers' intentions showed that they were seeking to have a conversation with respondent as a potential witness to an unrelated crime, and that, if respondent did not consent to that interaction, he would have been free to leave." But the officer's subjective motivation, and his or her reason for stopping a citizen—suspicion of a crime, to ask a question, perhaps to perform a community caretaking function—are irrelevant to the question of whether a seizure occurred.

¶ 55 In determining whether a seizure occurred, we view the actions of the officer and ask how a reasonable, innocent person would objectively perceive them—whether, "considering the totality of the circumstances, a reasonable person would believe he was not free to leave." *People v. Oliver*, 236 Ill. 2d 448, 456 (2010). The officer's subjective intent or reasoning has no place in the analysis. See *Mendenhall*, 446 U.S. at 554 n.6 ("the subjective intention of the DEA agent in this case to detain respondent, had she attempted to leave, is irrelevant" to whether seizure occurred, "except insofar as that may have been conveyed to the respondent"). As this court recently wrote, " '[t]he objective nature of the test also means that whether an encounter has become a seizure depends on the officer's objective behavior, not any subjective suspicion of criminal activity.' " *Lake*, 2015 IL App (4th) 130072, ¶ 28 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 568 (5th ed. 2012)). Thus, in determining whether a seizure occurred, "we need not concern ourselves with any suspicions

[the officer] may have had about defendant as he approached, intending to engage him in conversation." *Id.*

¶ 56    The reason *why* the officer stopped the citizen is the next question, assuming a seizure is found to have occurred. We proceed to ask whether the officer had justification to seize the citizen, to determine whether that seizure was reasonable. *People v. Brownlee*, 186 Ill. 2d 501, 517-18 (1999) ("As a general rule, all seizures must be reasonable ***."). See also *State v. Davis*, 517 A.2d 859, 863, 869 (N.J. 1986) (finding seizure occurred when officer blocked bicyclists' path with squad car, but finding seizure reasonable under circumstances). So the fact that the officers in *Thomas* were trying to stop a man they suspected to be involved in criminal activity, whereas here, the officers had a suspicionless reason for stopping Respondent, has no bearing on how a reasonable, innocent person would objectively perceive the officers' actions.

¶ 57    The special concurrence also suggests that we are taking liberties with the notion that the police vehicle's stop in front of Respondent on his bike was a seizure because Respondent did not, himself, argue as much at the suppression hearing. The concurrence says that Respondent only argued that he was seized when the officers placed him on the vehicle after recovering the weapon. The record shows that Respondent did not so limit his argument; he argued in his written motion that "[a]t the point that the police stopped [Respondent] he was 'seized' for purposes of Fourth and Fourteenth Amendment analysis." So we disagree that Respondent never raised that argument below, and he obviously raises it before us. We find no forfeiture.

¶ 58    We hold that the officers seized Respondent when they stopped his bicycle in the middle of the street.

¶ 59                                    B

¶ 60    The United States and Illinois Constitutions do not forbid seizures *per se*, only unreasonable seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. In the investigatory context, *Terry* is a narrow exception to the general rule that a citizen may not be detained without probable cause. That narrow exception typically requires a reasonable, articulable suspicion that the *person being detained* is involved in criminal activity. See *Terry*, 392 U.S. at 26-27; *United States v. Hensley*, 469 U.S. 221, 229 (1985); *Michigan v. Summers*, 452 U.S. 692, 699 (1981). But the United States Supreme Court has unanimously held that suspicionless detentions of citizens as potential witnesses to a crime, even if they are seizures, are not *per se* unconstitutional, but rather are subject to a reasonableness test. *Illinois v. Lidster*, 540 U.S. 419, 426 (2004).

¶ 61    *Lidster* involved a police roadblock in Lombard, Illinois. A vehicle had killed a bicyclist in a hit-and-run incident. About a week later, with the crime still unsolved, the police set up a roadblock in that same area, at roughly the same time of night as the hit-and-run incident, hoping to find motorists who might have information about it. *Id.* at 422. One of the vehicles in the line of waiting cars, when it was its turn to pull up to the roadblock, swerved and almost struck an officer, leading officers to inquire further and ultimately leading to a failed sobriety test and a DUI conviction. *Id.*

¶ 62    The Supreme Court agreed that a seizure occurred. *Id.* at 425-26 ("such an involuntary stop amounts to a 'seizure' in Fourth Amendment terms"). And it was undisputed that the officers *lacked* an individualized, articulable suspicion that the defendant had engaged in a

crime before stopping him. *Id.* at 423-24. Indeed, as the Court noted, "the context here (seeking information from the public) is one in which, by definition, the concept of individualized suspicion has little role to play." *Id.* at 424.

¶ 63     But the Court refused to apply a "rule of automatic unconstitutionality to brief, information-seeking highways stops" of this nature. "The fact that such stops normally lack individualized suspicion cannot by itself determine the constitutional outcome." *Id.* It might in other contexts, such as in one's home, but "[t]he Fourth Amendment does not treat a motorist's car as his castle," and "special law enforcement concerns will sometimes justify highway stops without individualized suspicion." *Id.*

¶ 64     On the other hand, it did not follow that "the stop is automatically, or even presumptively, constitutional. It simply means that we must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances." *Id.* at 426. In determining the reasonableness of a seizure in this context, it was necessary to consider " 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' " *Id.* at 427 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

¶ 65     Given that the investigation involved a death, the Court found that the "relevant public concern was grave." *Id.* The stop advanced this concern in that the checkpoints were uniquely tailored to identify people who might have been on the road the week earlier, by instituting them in the same area at the same time of night. *Id.* And "[m]ost importantly," the stops were only a minimal intrusion on motorists, as the wait in line was "a very few minutes at most" and "[c]ontact with the police lasted only a few seconds." *Id.* The Court thus upheld the seizure as reasonable. *Id.* at 428.[2]

¶ 66     While *Lidster* involved a police roadblock, its holding and test have been applied in other contexts involving suspicionless detentions of potential witnesses. See, *e.g.*, *State v. Woldt*, 876 N.W.2d 891, 896 (Neb. 2016) (detaining vehicle on road to question individual about a driver in nearby vehicle suspected of reckless driving); *Maxwell v. County of San Diego*, 708 F.3d 1075 (9th Cir. 2013) (separating witness family members in home and refusing to let witness-victim leave in ambulance); *State v. Whitney*, 54 A.3d 1284, 1286 (Me. 2012) (detaining vehicle to determine if driver had information as to whether three men conversing with him outside vehicle had left scene of car accident earlier that night); *State v. LaPlante*, 26 A.3d 337 (Me. 2011) (detaining vehicle to question driver about another driver's excessive speeding); *Gipson v. State*, 268 S.W.3d 185 (Tex. App. 2008) (detaining vehicle leaving parking lot of store that was just burglarized to question occupants as potential witnesses to robbery); *State v. Mitchell*, 186 P.3d 1071 (Wash. Ct. App. 2008) (detaining purported victim of robbery); *State v. Watkins*, 88 P.3d 1174, 1176 (Ariz. Ct. App. 2004) (detaining purported witness and victim after she tried to walk away from officers).

¶ 67     We believe that *Lidster* applies here as well. The Supreme Court gave several reasons for applying a reasonableness test to suspicionless police checkpoints, rather than a *per se* rule of

---

[2]We have characterized *Lidster*'s holding as unanimous. The employment of a reasonableness test for suspicionless detentions of potential witnesses, rather than a *per se* rule of unconstitutionality, was indeed joined by all justices. Three justices dissented only from the decision to decide the reasonableness of the checkpoint, rather than remanding to the Illinois courts to conduct that test. See *id.* at 428 (Stevens, J., concurring in part and dissenting in part, joined by Souter and Ginsburg, JJ.).

unconstitutionality, all of which apply here. First, if "[t]he Fourth Amendment does not treat a motorist's car as his castle" (*Lidster*, 540 U.S. at 424), it most certainly does not treat a person's bicycle as such. Second, the Court's rationale that "the law ordinarily permits police to seek the voluntary cooperation of members of the public in the investigation of a crime" (*id.* at 425) is no less applicable to bicyclists than it is to motorists. Finally, the Court noted that information-seeking highway stops are "less likely to provoke anxiety or *** prove intrusive," "are likely brief," and are not likely to elicit self-incriminating information. *Id.* We acknowledge that being stopped on a bicycle is more confrontational than being one of many drivers stopped at a roadside checkpoint. But given that the ultimate goal of the officers is to seek information, not to investigate the bicyclist for commission of a crime, the likelihood of a self-incriminating confrontation is just as low as it would be for a driver; we do not see the intrusion or anxiety to be so great as to justify a different test for bicyclists than for drivers stopped at a checkpoint.

¶ 68      In light of *Lidster*, it would be inappropriate to impose a *per se* rule of unconstitutionality for the suspicionless roadway stop of a bicyclist who is believed to be a witness to a crime committed by someone else. As the Supreme Court did there, we instead apply a reasonableness test to the officers' conduct here.

¶ 69      Applying the reasonableness test from *Lidster*, we find the seizure here to have been reasonable. The investigation underway was a homicide, every bit as grave a concern as the vehicular death in *Lidster*, 540 U.S. at 427. And the stop in this case was far more tailored to advance the public's interest in solving this homicide than the stop in *Lidster*. There, *all* drivers were stopped; their connection to the bicyclist's death was nothing more than the fact that, one week after that incident, they were on the same road, at the same time of night, as the bicyclist when he died. Yet that was sufficient tailoring for the Supreme Court. See *id.* Here, officers were targeting a specific person whose assistance was sought, and they believed (correctly) that they had found that specific person. The stop could not have been more narrowly tailored toward the public interest in solving this homicide.

¶ 70      The final factor is the severity of the interference with individual liberty. See *id.* We do not deny that the officers stopped Respondent in a rather dramatic, abrupt fashion in the middle of the road. But that plays into whether the stop constituted a seizure, and we have already found that it did. All seizures, by definition, interfere with one's liberty. This reasonableness test does not even come into play unless a court first finds a seizure to have occurred. The supreme court was referring, in this final factor, not to the fact that an individual is detained in the first instance, but to the duration and scope of that detention. *Id.*

¶ 71      And on that question, we would have to give a grade of "incomplete." The officers' detention of Respondent for questioning was interrupted after the first question—asking Respondent his name—at which point Officer Ludwich became suspicious of the possible firearm in Respondent's pants pocket. It quickly devolved into a search and arrest. For what it's worth, Officer Ludwich testified without contradiction that his intention had been to ask Respondent if he would be willing to come to the police station for questioning, and that Respondent would have been free to decline that request and be on his way. Any way you view it, we cannot say that Respondent has carried his burden of showing that the initial detention, prior to the search, constituted a severe interference with his liberty.

¶ 72    Each of the three factors favors a finding of reasonableness. We thus hold that the traffic stop was a seizure, but a reasonable one.

¶ 73                                                    C

¶ 74    Because we hold that the officers complied with the fourth amendment in stopping Respondent, we turn to the question of the frisk that followed the stop.

¶ 75    A frisk for weapons, following a valid stop, must be based on a reasonable suspicion that the individual is armed and thus dangerous. *Terry*, 392 U.S. at 10, 27; *Colyar*, 2013 IL 111835, ¶¶ 34-37. The reasonable suspicion must be more than a mere hunch, but the officer need not be absolutely certain the individual is armed. *Terry*, 392 U.S. at 27; *Colyar*, 2013 IL 111835, ¶¶ 36, 40. The officer must point to "specific and articulable facts" that demonstrate the reasonableness of the suspicion. *Terry*, 392 U.S. at 21; *Colyar*, 2013 IL 111835, ¶ 40.

¶ 76    At the outset, we agree with the State that Respondent's reliance on our decision in *Harris*, 2011 IL App (1st) 103382, is misplaced. In *Harris*, the initial encounter was an investigatory stop—*i.e.*, a *Terry* stop—that we found unreasonable. *Id.* ¶ 15. So it followed that the subsequent search was not justified because "[t]he police may only perform a protective search if they are entitled to stop the person in the first place." *Id.* ¶ 17. Having determined that the stop here complied with the fourth amendment, *Harris* does not apply.

¶ 77    Besides *Harris*, Respondent relies on additional cases where this court has stated that a bulge in the defendant's clothing, by itself, does not create reasonable suspicion. See, *e.g.*, *People v. Surles*, 2011 IL App (1st) 100068, ¶ 40; *People v. Goodum*, 356 Ill. App. 3d 1081, 1085 (2005); *People v. Byrd*, 47 Ill. App. 3d 804, 808 (1977). We take no issue with that proposition of law. But the evidence here went beyond testimony of seeing a mere bulge.

¶ 78    The officer testified that, as he approached within about four feet of Respondent, he saw the silhouette of a handgun in Respondent's jeans. The trial court, on reconsideration of the suppression issue, accepted the officer's testimony. Indeed, the court's very basis for reversing its previous decision was that the court had believed that a .22 caliber was small—and thus unlikely to be observed inside a pants pocket—but after seeing the gun, the court realized it was bigger than it had thought, and thus it found the officer's testimony credible.

¶ 79    We review that credibility determination for manifest error. *Almond*, 2015 IL 113817, ¶ 55. We find no error. We cannot say that the opposite conclusion was clearly evident. Nor has Respondent supplied any reason for us to do so. The only basis Respondent raises for ignoring this "silhouette" testimony, and focusing only on the "bulge" testimony, is that the testimony about the silhouette came on cross-examination by the State at the suppression hearing. We are aware of no case law suggesting that testimony on cross-examination is less valuable than direct testimony. And to the extent that Respondent suggests that this makes the testimony less likely—elicited as it was by the friendly prosecutor, presumably—the trial court disagreed and found it credible, and we find no reason to disturb that finding.

¶ 80    We agree with the trial court that Officer Ludwich's observation of not merely a bulge, but the outline of a weapon, in Respondent's jeans was a specific and articulable fact that supported a reasonable suspicion that Respondent was armed.

¶ 81    The complicating factor here is that a *Terry* frisk usually requires two things: (1) a reasonable suspicion that the detainee is involved in criminal activity (thus justifying the

- 14 -

stop) and (2) a reasonable suspicion that the individual is armed (thus justifying the frisk). *Terry*, 392 U.S. at 24; *People v. Evans*, 2017 IL App (4th) 140672, ¶ 34; see also *United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (*en banc*). We have just held that the second condition was satisfied. Officer Ludwich had a reasonable suspicion that Respondent was armed. But it is undisputed that the first condition is *not* present here. The State concedes that the officers did not suspect Respondent of criminal wrongdoing when they first stopped him (that is, before Ludwich got close to Respondent and saw the outline of the gun).

¶ 82    In the previous section of this opinion, we found the stop here constitutionally valid, as it was a reasonable seizure based on the officer's need to obtain information from a potential witness to a homicide. Even absent reasonable suspicion of criminal wrongdoing, the officers validly stopped Respondent. So the question becomes, during a valid but *suspicionless* seizure, if an officer develops a reasonable suspicion that the detainee is armed, can he conduct a protective search of that individual for weapons?

¶ 83    Initially, we note that the State, and some courts, have pointed to our supreme court's decision in *Colyar*, 2013 IL 111835, for the answer. In that case, officers approached individuals in a vehicle that was blocking one of the entrances to a motel parking lot. *Id.* ¶¶ 6-7. Upon approach and initial questioning, the officers saw a single, large bullet in a plastic bag on the console of the vehicle. *Id.* ¶ 8. At that point, the officers ordered the occupants out of the car and removed the plastic bag, finding additional large-round ammunition inside. *Id.* ¶ 9. They then patted down the occupants and found another bullet in one of the detainees' pockets, at which point they cuffed the occupants, conducted a full search of the vehicle, and found a revolver. *Id.* ¶ 10. Our supreme court held that the search was valid, as the sighting of the bullet in plain view inside the automobile provided officers with a reasonable suspicion that one or more of the vehicle's occupants were armed. *Id.* ¶ 52.

¶ 84    The court in *Evans*, 2017 IL App (4th) 140672, ¶ 37, wrote that "[t]he *Colyar* decision is significant because the original encounter between the officers and the citizens began as a *consensual encounter* but escalated into a permissible *Terry* frisk after the police officers, during the *consensual encounter*, developed reasonable suspicion the citizens may be armed and dangerous." (Emphases added.) The court in *Evans* thus held that, under *Colyar*, "police officers need not have reasonable suspicion of criminal activity to conduct a *Terry* frisk for weapons during a consensual encounter but, rather, need only have reasonable suspicion the citizen is armed and potentially dangerous." *Id.*

¶ 85    The court in *People v. Slaymaker*, 2015 IL App (2d) 130528, ¶ 18, cited *Colyar* for the proposition that "an officer initially engaged in *community caretaking* may develop a reasonable suspicion that the subject of the inquiry has a weapon" (emphasis added) and thus have sufficient grounds to search for weapons.

¶ 86    We must respectfully disagree with these interpretations of *Colyar*, however, for the initial encounter in *Colyar* was neither a consensual encounter nor a community-caretaking stop unrelated to the investigation of crime. The supreme court made it clear, at least three separate times in the majority opinion, that the initial encounter with the occupants of the vehicle was a *Terry* stop. See *Colyar*, 2013 IL 111835, ¶ 41 (noting that parties conceded that defendant's initial encounter with police "was lawful under *Terry*"); ¶ 52 ("Following the initial lawful *Terry* stop and the observation of the bullet in plain view," officers justifiably developed reasonable suspicion that gun was present in vehicle); and ¶ 58 (noting again that defendant conceded "that this incident began as a proper *Terry* stop"). Justice Thomas, in his

- 15 -

concurrence, likewise noted that the defendant had conceded that "this began as a proper *Terry* stop" and went further to argue that, even absent that concession, the facts established sufficient indicators of criminal activity to justify a *Terry* stop. *Id.* ¶¶ 68-69 (Thomas, J., concurring).

¶ 87     A consensual encounter does not implicate the fourth amendment because the individual consents to questioning and is thus not seized. *Luedemann*, 222 Ill. 2d at 544. A seizure under the "community caretaking" function does not involve the investigation of crime at all. *Id.* at 548. Neither of those categories applies to *Colyar*'s facts. *Colyar* involved a *Terry* stop—an investigatory detention based on officers' reasonable, articulable suspicion that criminal activity was afoot. See *id.* at 544 ("brief investigative detentions, or '*Terry* stops,' *** must be supported by a reasonable, articulable suspicion of criminal activity").

¶ 88     To be sure, there was a dispute among the justices in *Colyar* about whether the defendant had, in fact, conceded that the encounter began as a valid *Terry* stop. The majority and the concurrence believed that the defendant had so conceded. See *Colyar*, 2013 IL 111835, ¶¶ 41, 58; see also *id.* ¶ 68 (Thomas, J., concurring). The dissent believed that no such concession had been made, further noting that the trial court had found the encounter to have been consensual. *Id.* ¶¶ 79, 89-94. That dispute among the justices does not change our takeaway from the case. The majority opinion considered the encounter to have begun as a valid *Terry* stop; in construing that decision as precedent, we obviously must do so as well.

¶ 89     So *Colyar* does not answer our question. However much the justices disagreed on the defendant's concession in that case, ultimately the decision merely stands for the proposition that, in the course of a valid *Terry* stop—that is, where officers have a reasonable suspicion of criminal activity justifying an initial detention—officers may conduct a reasonable search for weapons if they develop a reasonable belief that one of the detainees is armed. Our question is different.

¶ 90     Our question is whether, in the context of a *suspicionless* (but reasonable) seizure, the later development of a reasonable suspicion that the detainee is armed justifies a patdown of that individual. Though Justice Thomas pondered that very question in his concurrence (see *id.* ¶¶ 71-77), the majority did not reach that question. We do so now.

¶ 91     We believe the answer is yes. In the course of detaining an individual during a suspicionless but reasonable seizure, an officer may frisk the individual if the officer develops a reasonable suspicion that the individual is armed.

¶ 92     We draw this conclusion from the U.S. Supreme Court's decision in *Arizona v. Johnson*, 555 U.S. 323, 334 (2009), which held that the passenger of a stopped car, not himself suspected of engaging in criminal behavior, could be patted down for weapons when officers developed a reasonable suspicion that he was armed. There, officers stopped a car after a license-plate check showed a suspended registration. *Id.* at 327. Inside the car were three individuals—a driver, a front-seat passenger, and a back-seat passenger. *Id.* "In making the stop[,] the officers had no reason to suspect anyone in the vehicle of criminal activity." *Id.*

¶ 93     One officer instructed the driver to step out of the car. *Id.* at 328. Another officer observed that the back-seat passenger—the defendant—was acting in a nervous and suspicious manner, was dressed in a manner that suggested affiliation with a certain street gang, and had a police scanner in his back pocket. *Id.* The officer talked to the defendant and learned some information that furthered her suspicion that he might be a gang member and

"might have a weapon on him." *Id.* She ordered the defendant out of the car, patted him down, and felt the butt of a gun. *Id.*

¶ 94 The Supreme Court noted that the stop was a *Terry* stop, as are most stops of cars on the road. *Id.* at 330. But even if the police had reason to suspect that the *driver* of the car had engaged in criminal activity—a traffic infraction—the Court acknowledged the obvious fact that this suspicion did not extend to the *passengers* of the car. *Id.* at 331 (citing *Maryland v. Wilson*, 519 U.S. 408, 413 (1997), for same proposition).

¶ 95 The Supreme Court held, however, "[t]he police need not have, in addition, cause to believe that any *occupant* of the vehicle is involved in criminal activity." (Emphasis added.) *Id.* at 327. As long as the officer had a reasonable suspicion that the passenger was armed, the officer could frisk that individual even absent a pre-existing suspicion that the passenger was engaged in criminal activity. *Id.*

¶ 96 *Johnson* controls the outcome here. When a car is pulled over for a traffic offense, the passenger of the car is seized no less than the driver. *Id.* at 332; *Brendlin v. California*, 551 U.S. 249, 256-59 (2007). So the passenger in *Johnson* stood in the same shoes as Respondent here—he was reasonably seized without individualized suspicion of criminal wrongdoing. *Johnson* holds that if, in the course of such an encounter, the officer develops a reasonable suspicion that the individual is armed, he may frisk the individual for weapons. It follows that, when Officer Ludwich developed a reasonable suspicion that Respondent was armed, he was entitled to frisk him for weapons.

¶ 97 The fact that *Johnson* involved a vehicle with multiple occupants, whereas this case involves one person on a bike, does not suggest a different outcome. It is true that *Johnson*, relying on previous decisions, noted the unique risks that vehicle stops pose to officers—the lack of information about the occupants, the possibility they might employ violence to avoid detection of other unknown criminal conduct, the ability to hide weapons in many places—risks that are multiplied by the number of the occupants inside. See, *e.g.*, *Johnson*, 555 U.S. at 331 (noting that "the risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop' ") (quoting *Wilson*, 519 U.S. at 414); *Michigan v. Long*, 463 U.S. 1032, 1047 (1983) (noting that traffic stops are "especially fraught with danger to police officers"); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (recognizing "the inordinate risk confronting an officer as he approaches a person seated in an automobile"); *Wilson*, 519 U.S. at 413-414 (noting stop of vehicle with multiple passengers "increases the possible sources of harm to the officer," as "the motivation of a passenger to employ violence ... is every bit as great as that of the driver").

¶ 98 And we acknowledge that the stop of a single bicyclist does not pose the same risks, or at least not to the same magnitude, as the stop of a car with multiple occupants. Occupants of a vehicle are usually less visible to an officer than a bicyclist and have many more places to hide a weapon within the car.

¶ 99 But if the risks are less in the context of a stop of a bicyclist, they are not eliminated altogether. A bicyclist could have a weapon on his person, as Respondent did here. And bicycles sometimes have compartments that could hide a weapon. But more importantly, once we reach the point that an officer has developed a reasonable suspicion that the bicyclist is armed—as he did here—any distinction between a biker and a car full of people breaks

down. A weapon in the hands of a bicyclist is no less a threat to officer safety than a weapon in the hands of a back-seat passenger.

¶ 100    Our holding does not give *carte blanche* to officers to randomly stop whomever they please and then, if they develop a suspicion that the individual is armed, to frisk that person. We emphasize that we have found here that officers had a valid, albeit suspicionless, basis for seizing Respondent in the first instance—before Officer Ludwich approached Respondent and observed the outline of a weapon in his jeans. That is no minor detail; without that valid basis for the initial stop, without a *reasonable* seizure having first taken place, any resulting frisk or other search would be invalid. *Harris*, 2011 IL App (1st) 103382, ¶ 17; *Adams*, 407 U.S. at 146 ("*So long as the officer is entitled to make a forcible stop*, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." (Emphasis added.)).

¶ 101    We also emphasize that our holding is limited to the context of this case: When officers effect a suspicionless but reasonable seizure, they may conduct a protective patdown for weapons if they have developed a reasonable suspicion that the individual they have seized is armed.

¶ 102    We do not address here other types of suspicionless encounters with police—"consensual encounters" (which are not seizures at all) or seizures effected pursuant to the non-investigatory "community caretaking" function concerning public safety or assistance. See *Luedemann*, 222 Ill. 2d at 544-49. We express no opinion on whether our holding might vary in those other contexts.

¶ 103    Respondent does not challenge the full search of Respondent that followed the frisk. Recall that, upon frisking Respondent, Officer Ludwich's suspicion that Respondent was armed was confirmed (or at least enhanced), at which point the officer asked Respondent what was in his pocket. Respondent admitted to having a gun. The officers then searched him and found the gun in that very pocket. Respondent has challenged the initial stop as well as the frisk, unsuccessfully in our eyes, but does not challenge the actual search. Having found against him on the arguments he has raised, we have no occasion to go further.

¶ 104    In sum, the officers seized Respondent when they stopped him in the middle of the street on his bike. Their seizure was reasonable, in that they targeted Respondent for questioning as a witness, not a suspect, in the most serious of crimes, a homicide. And once they had effected a reasonable seizure and only *then* developed a reasonable suspicion that Respondent was armed, the officers were entitled to conduct a protective patdown of Respondent for weapons.

¶ 105                                                    D

¶ 106    Respondent's final contention regarding the trial court's decision to deny his motion to suppress is that the court abused its discretion when it *sua sponte* ordered him to produce his jeans and examined the gun during the hearings on the State's motion to reconsider. The State responds that the trial court properly considered the size of the gun and the pants that Respondent wore on the day of the incident to ensure that justice was done.

¶ 107    As noted earlier, the basis for the State's motion to reconsider was that the court erred in its application of the law and that a police officer is not required to ask questions before

recovering a weapon. The State argued that the officer's reasonable belief that Respondent was armed was enough to allow for a protective frisk in the interest of officer safety.

¶ 108    In granting the State's motion to reconsider, the court reasoned as follows:

"I think I made a mistake in this case in my application of the law to the facts. It's true that [Respondent] was not committing a crime. He was not doing anything illegal. They were approaching him as a witness. But the officer testified that based on his experience, he immediately knew it was a gun. He saw a gun in the pants pocket of [Respondent's] jeans. And, you know, I was uncertain as to the size. He said what the size was, but I wasn't sure that a 22 caliber could be that big. And now I see that it is.

He testified that it appeared to be a handgun, a silhouette of a handgun. He knew that based on his experience. He was within four feet of [Respondent]. This officer had been a police officer for 23 years. He's recovered hundreds of handguns. He was within four feet and getting closer when he saw this silhouette of a handgun, and as soon as he tapped it, he knew what it was.

So I'm reversing my ruling."

¶ 109    We review *de novo* the trial court's ruling on a motion to reconsider that is based only on the trial court's application of existing law. *People v. Pollitt*, 2011 IL App (2d) 091247, ¶ 18. When based on new information or argument on a different issue, we ask whether the trial court's reconsideration was an abuse of discretion. *Id.* As we have just held above, the State was correct on the law—Respondent was not entitled to suppression of the gun from evidence. But because the court relied on new facts, we apply an abuse-of-discretion standard. A trial court abuses its discretion where it acts arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeds the bounds of reason and ignores recognized principles of law such that substantial prejudice results. *Id.*

¶ 110    Respondent claims that the trial court erred in reopening the proof without a motion from the State. In requesting to view the pants Respondent wore at the time of the stop as well as the gun recovered by police, the court, in Respondent's view, "discarded its neutral robes and became an advocate for the State." And he insists that the trial court relied on a fact never introduced into evidence—that Respondent was wearing a certain kind of "skinny" jeans—in reaching his conclusion. We reject each of these arguments.

¶ 111    First, trial courts have the inherent power to correct their previous rulings. *People ex rel. Daley v. Crilly*, 108 Ill. 2d 301, 310 (1985). A court also has the authority to allow the State to reopen its case, even without a motion from the State, including during a suppression hearing. *People v. Gonzalez-Carrera*, 2014 IL App (2d) 130968, ¶ 21; *People v. Kuntz*, 239 Ill. App. 3d 587, 592 (1993) ("while motions to reopen are usually made by one of the parties, the court may take such action on its own motion where a sound basis for the action appears in the record").

¶ 112    Nor did the trial court assume the role of advocate. "As a general proposition it is never improper for a judge to aid in bringing out the truth in a fair and impartial manner." *People v. Franceschini*, 20 Ill. 2d 126, 131-32 (1960). As the supreme court explained:

" 'It is the judge's duty to see that justice is done, and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry has not been pursued it is his duty to interpose and either by suggestions to counsel or an

- 19 -

examination conducted by himself avoid the miscarriage of justice, but in so doing he must not forget the function of the judge and assume that of the advocate.' " *Id.* at 132 (quoting *People v. Lurie*, 276 Ill. 630, 641 (1917)).

¶ 113    In *Franceschini*, the defendant was convicted of burglary. *Id.* at 128. On appeal, he argued that the trial court committed prejudicial error when, after both sides had rested and oral argument had begun, the court suggested to the prosecutor that he put on evidence showing how the burglar entered the apartment. *Id.* at 128, 131. Our supreme court disagreed. *Id.* at 132.

¶ 114    As the court explained: "It is in the sound discretion of the trial court whether a case may be opened up for further evidence, and this discretion will not be interfered with except where it is clearly abused." *Id.* The court determined that, where the trial judge merely remarked that he had heard no evidence on the point and suggested that, if such evidence existed, it might be offered at that time, the trial judge did not assume the function of an advocate. *Id.* The court found no abuse of discretion. *Id.*

¶ 115    Here, the trial court wanted to see the gun and the pants to further test the credibility of Officer Ludwich's testimony that he was able to see the outline of the gun inside the pants pocket. The pants could not be produced, but the gun was. That additional evidence could have cut either way. It could have supported his previous skepticism of Ludwich's testimony. Instead, it had the opposite effect. The trial court stated that the gun was larger than it had originally thought, lending credence to the officer's testimony. But the fact that this new evidence hurt rather than helped Respondent does not mean that the court was on an "activist mission to find grounds to reverse." It means the court was on a mission to uncover the truth.

¶ 116    Finally, Respondent claims that, when the pants could not be produced, the trial court improperly "relied upon the officers' off-the-record comment that [Respondent] was wearing skinny jeans at his arrest to reverse itself," what Respondent deems "improper fact-finding" that "colored the court's perception of the case throughout the proceedings."

¶ 117    The record does not support that claim. The fact that the court wanted to view the pants indicates to us that it did not have a pre-existing opinion about them. The court never stated anything about Respondent's jeans in his factual findings and legal conclusions when granting the motion to reconsider. The court's off-handed, wry comment that Respondent "could 'wear his skinny jeans to the appellate court' " does not convince us that we should disregard the court's factual findings and find error.

¶ 118    The court did not abuse its discretion in reopening the proof, did not act as an advocate, and did not improperly rely on information outside the evidentiary process.

¶ 119    For all of these reasons, we affirm the trial court's denial of the motion to suppress.

¶ 120    III

¶ 121    There are two remaining challenges in this appeal, one contested and one uncontested. The contested challenge is to the sufficiency of the evidence as to one of the two adjudications of delinquency for AUUW, the one regarding his possession of a firearm without a valid FOID card. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2016). Respondent does not challenge the sufficiency of his other AUUW adjudication. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2016). Nor does Respondent challenge his UPF adjudication on sufficiency grounds.

¶ 122     The other issue is uncontested. The parties agree that, based on the one-act, one-crime doctrine, Respondent's possession of one gun is subject to only one adjudication, not the three he sustained. See *People v. Johnson*, 237 Ill. 2d 81, 97 (2010) (one-act, one-crime rule prohibits multiple convictions "that are based upon precisely the same single physical act"). Under this rule, if a defendant is convicted of more than one offense arising from the same single physical act, the conviction for the less serious offense must be vacated. *Id.* The rule applies in juvenile delinquency proceedings. See *In re Samantha V.*, 234 Ill. 2d 359, 375 (2009).

¶ 123     The parties also agree that all three offenses are class 4 felonies with the same punishments, and thus it is impossible to differentiate which of these offenses is the more serious. *Cf.* 720 ILCS 5/24-1.6(d)(1) (West 2016), with 720 ILCS 5/24-3.1(b) (West 2016). Thus, the parties agree that, rather than remand this matter to the trial court to determine which offense is the most serious—an impossible task—this court should vacate and merge the UPF and one of the AUUW convictions into the other AUUW adjudication. See, *e.g.*, *People v. Price*, 221 Ill. 2d 182, 194 (2006) (supreme court vacated one of two theft convictions rather than remand to trial court, where punishments were same and where defendant "expressed no preference" for which of two to vacate); *People v. Gordon*, 378 Ill. App. 3d 626, 642 (2007) (where three DUI convictions were equally serious, merging two convictions with third conviction without remand to trial court).

¶ 124     We agree with the parties that the UPF adjudication, and one of the AUUW adjudications, should be vacated and merged into the second AUUW adjudication. The parties have expressed no preference as to which of the AUUW adjudications to vacate. Legally, it makes no difference to Respondent.

¶ 125     So we will vacate and merge the UPF adjudication and the AUUW adjudication premised on section 24-1.6(a)(1), (a)(3)(C) (regarding the lack of a FOID card) into the remaining AUUW adjudication under section 24-1.6(a)(1), (a)(3)(I). Thus, it is unnecessary to reach the question of whether Respondent was proven guilty beyond a reasonable doubt of violating section 24-1.6(a)(1), (a)(3)(C). Rather than reverse that conviction, as Respondent requests, we will vacate it—for all practical purposes the same relief, but based on the one-act, one-crime rule.

¶ 126                                        IV

¶ 127     We affirm Respondent's adjudication of delinquency for AUUW under section 24-1.6(a)(1), (a)(3)(I) of the Criminal Code of 2012. We vacate Respondent's remaining adjudications under the one-act, one-crime rule.

¶ 128     Affirmed in part, vacated in part.

¶ 129     JUSTICE McBRIDE, specially concurring:

¶ 130     Although I agree with the decision to affirm the circuit court's denial of the respondent's motion to suppress, I do not agree that respondent was seized when the police officers stopped their vehicle to question him as a possible witness to a homicide.

¶ 131     As I will discuss below, this case presents circumstances notably different from the majority of search and seizure cases because respondent here was not the subject of police

suspicion when he was approached by the officers. The officers' purpose in engaging with respondent was not to gain information about respondent, but to have a conversation with him regarding information he could provide about an unrelated murder investigation.

¶ 132    As our supreme court has recognized, "the law clearly provides that a police officer does not violate the fourth amendment merely by approaching a person in public to ask questions if the person is willing to listen." *People v. Luedemann*, 222 Ill. 2d 530, 549 (2006). Law enforcement officers may approach persons on the street or in public places to seek their cooperation or assistance, or to request or impart information, without being required to articulate a certain level of suspicion to justify that encounter. Therefore, a police officer may approach a person to inquire about witnessing a crime, if that person is willing to talk to the officer. Likewise, police officers in their investigative capacity do not run afoul of the constitution by approaching and asking citizens to assist them in solving crimes.

¶ 133    To determine whether and when a person is seized, we must examine the circumstances surrounding the encounter. *Id.* A person has been considered seized only when considering the totality of the circumstances presented, a reasonable person would believe that he or she was not free to leave. *Mendenhall*, 446 U.S. at 554. When considering whether an encounter between the police and a minor was consensual, as in this case, the standard will be modified to take the minor's age and other relevant factors into account. *In re Elijah W.*, 2017 IL App (1st) 162648, ¶¶ 27, 32. On a motion to suppress, respondent, as the movant, bears the burden of proof that the search and seizure were unlawful. *People v. Fields*, 2014 IL App (1st) 130209, ¶ 18.

¶ 134    The supreme court has stated that the following factors would be indicative of a seizure: (1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) some physical touching of the person, or (4) the use of language or tone compelling the individual to comply with the officer's request. *Luedemann*, 222 Ill. 2d at 553. In the language of our supreme court,

> "the absence of [these] factors, while not necessarily conclusive, is highly instructive. If those factors are absent, that means that only one or two officers approached the defendant, they displayed no weapons, they did not touch the defendant, and they did not use any language or tone of voice indicating that compliance with their requests was compelled. Obviously, a seizure is much less likely to be found when officers approach a person in such an inoffensive manner." *Id.* at 554.

¶ 135    With these concepts in mind, we turn to the circumstances provided by this case. The testimony presented at the pretrial hearing came not from respondent, but from a single witness, Chicago Police Officer Ludwich, who testified that he and his partner, Officer Rottman, were patrolling in an unmarked car and looking for respondent, whom they believed to be a potential witness to a homicide. The officers did not know the respondent, but they had his name and a photograph, and they were aware that he was about 17 years old and that he lived in the area they were patrolling. The officers were looking for respondent with the specific purpose of asking him if he would be willing to come to the police station to provide information as a possible witness. Officer Ludwich testified, however, that he had no intention of bringing respondent into the station unless he agreed.

¶ 136    When the officers saw respondent on a bicycle and determined that he appeared to match the photograph they had of the potential witness, they stopped their vehicle directly east and some 10 feet ahead of the path of respondent to confirm his identity by name. The

officers—who were not in uniform but were wearing vests, identifying badges, and name tags—stepped out of their vehicle. Officer Rottman asked respondent what his name was, and respondent replied that his name was Tyreke H. Respondent was described as "cooperative," and there was no evidence of a tone or language compelling the respondent to stop, and no evidence of physical touching or contact with respondent at the time the officers initially approached.

¶ 137    Respondent was standing near the vehicle's driver's side door when Officer Ludwich saw a "bulge" of what appeared to be the "silhouette" of a gun in respondent's right front pants pocket. Moments later, the officer touched the object on the outside of respondent's clothing. The touching was described as a "tap" of respondent's pants pocket, and the officer inquired: "What's this?" Respondent acknowledged that it was a gun. Officer Ludwich testified that he then conducted a protective pat down, with respondent's hands on the driver's side of the car, and respondent was not free to leave.

¶ 138    The above described facts were undisputed, and respondent provided no contrary testimony of any kind surrounding the circumstances of the events leading up to his arrest.

¶ 139    Considering all of the factors in light of the testimony presented at the hearing on respondent's motion to suppress, the totality of the circumstances surrounding the officers' encounter with respondent, which the trial court heard and accepted as credible, supports only one conclusion—that respondent was not seized when the officer parked the squad car and walked up to respondent on the street. Like the hypothetical posed in *Luedemann*, which the supreme court described as an "inoffensive" approach that would be unlikely to constitute a seizure, the approach of respondent in this case involved "only one or two officers ***, [who] displayed no weapons, *** did not touch [respondent], and *** did not use any language or tone of voice indicating that compliance with their requests was compelled." See *Luedemann*, 222 Ill. 2d at 554.

¶ 140    Instead, it was only after the officers approached respondent for the sole purpose of asking him to accompany them to the police station as a potential witness, that Officer Ludwich made observations that immediately established a reasonable, articulable suspicion that respondent was armed with a firearm. Because of that reasonable, articulable suspicion, the officer inquired further, tapping on respondent's pocket and asking him what the object was. Based upon respondent's admission that the object was a gun, and upon the plain feel the officer had after tapping on the hard metallic object he believed was a gun, the officer properly recovered the weapon. Accordingly, the officer had a proper basis for a *Terry* stop, where "a totality of the circumstances reasonably lead the officer to conclude that criminal activity may be afoot and the subject is armed and dangerous." *People v. Colyar*, 2013 IL 111835, ¶ 32 (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

¶ 141    To support his claim that he was immediately seized when the police car came to a stop, respondent relies primarily upon the *Thomas* decision. He repeatedly argues that the officers seized him because they "blocked his path," and "forced [him] to bring his bike to a stop to avoid hitting the car." Respondent contends that officers' actions here "are identical to the officers' actions in *Thomas*. The majority agrees that the *Thomas* decision is "squarely applicable" (see *supra* ¶ 38) because respondent "was halted in the middle of the road by a vehicle that cut off his path of travel, with two officers immediately emerging from that car to address him" (see *supra* ¶ 41). I disagree. I find nothing in the record that would support respondent's characterization of the events leading up to his interaction with the officers. In

my opinion, the majority's holding, which relies upon the respondent's unfounded representations, is unsupported by any testimony in the record. In fact, defense counsel in the pretrial proceedings did not even argue that the police officers blocked defendant's path with their squad car. Counsel argued that this was "a case of actually everyone doing what they're supposed to be doing"—that the police officers "were there to look for [respondent]" and that respondent was "cooperative with them." Counsel's position was that there was no basis for the officer's belief that the bulge was a gun and that defendant was seized when the officers "put [defendant] on the police car where he clearly would not have been able to leave."

¶ 142    Because counsel never argued that respondent was seized by the officers by stopping their squad car in his path of travel, the record is not properly developed for a review of this issue. The evidence elicited on how and where respondent came to a stop is scant, and the majority's decision to call this a seizure based on the limited record, expands *Thomas* beyond its envisioned parameters.

¶ 143    Based upon the circumstances testified to here, it is my opinion that these officers never blocked or physically positioned their vehicle to stop the forward path of respondent so that he had nowhere else to go but into the police vehicle. Although there was testimony that the police vehicle stopped near respondent, there was no evidence in the record that would support a finding that the police car was pulled or turned in front of respondent's bicycle. Instead, the record shows that when the police vehicle was stopped, it was east and some ten feet in front of respondent. Officer Ludwich testified that when the vehicle was stopped, respondent rode his bicycle right towards the driver's side of the officers' vehicle. He also testified that he walked around the back of the car, and continued around to the driver's side where respondent was located across from and near his partner, Officer Rottman. This testimony, in my opinion, further demonstrates that the path of respondent was not blocked by the police vehicle because respondent was not directly behind, but was alongside, the vehicle when Officer Ludwich approached him.

¶ 144    Unlike the circumstances presented here, the *Thomas* decision involved a police officer's clear effort to physically block and attempt to stop an individual riding on a bicycle by positioning the police squad directly "across" the defendant's path of travel. *People v. Thomas*, 198 Ill. 2d 103, 106 (2001). At the time the officer attempted the stop, the defendant was riding his bicycle while holding a police scanner. The officer suspected defendant was delivering drugs from his bicycle, but admitted that he had no actual information that defendant was carrying illegal drugs on the night in question, and conceded that it was not illegal for the defendant to possess a scanner. *Id.* at 107. The officer radioed another officer to inform him of his intention to stop the defendant. The officer then "overtook the defendant, passed him by, and positioned his squad car across the defendant's path of travel," at which time, the defendant fled down an alleyway. *People v. Thomas*, 315 Ill. App. 3d 849, 851 (2000).

¶ 145    Before reaching its ultimate holding, the supreme court pointed out that the officer's intent was to stop, detain, and interrogate the defendant based solely upon a suspicion that fell far short of warranting any stop. Although the supreme court concluded the police officer's attempted road block would have been an unconstitutional seizure had the defendant submitted to the police authority, it went on to hold that the defendant's flight gave rise to a suspicion that justified investigatory stop and the subsequent police conduct in forcibly arresting the defendant was not constitutionally infirm.

¶ 146    The *Thomas* decision fails to support the analysis used by the majority to reach its conclusion as to when the seizure occurred in this case. Contrary to respondent's contentions, there was no testimony during these proceedings that respondent was forced to bring his bike to a stop to avoid hitting the police car or that the car was pulled into respondent's path. In fact, there was no testimony at all at the hearing on the motion to suppress as to when respondent got off his bicycle, or how or where he came to a stop.

¶ 147    As the majority recognizes, the *Thomas* court described the officer's actions in the following way:

> "Officer Melton was not trying to engage in the kind of personal intercourse between police officers and citizens that falls short of a seizure. He was trying to effect a forceful stop and detention. ***

> * * *

> *** Officer Melton maneuvered his squad car to effect an abrupt stop of a moving vehicle by cutting off the path ahead. This was clearly an effort to effect an investigatory stop and detention.

> *** Officer Melton sped past the defendant, made a sudden veer at a right angle to the defendant's travel route, and deployed his squad car in a manner designed to cut off the defendant's roadway." *Supra* ¶ 35.

¶ 148    The officer's actions in *Thomas*, as described above, are nothing like the circumstances of this case. The officers here were not "trying to effect a forceful stop and detention." The only evidence regarding the officers' intentions showed that they were seeking to have a conversation with respondent as a potential witness to an unrelated crime, and that, if respondent did not consent to that interaction, he would have been free to leave. There was also no testimony that the officers "maneuvered [the] squad car to effect an abrupt stop of [respondent's bicycle] by cutting off the path ahead." To the contrary, the record shows that the officers were patrolling the area and using a photograph to try to identify and locate respondent, whom they did not know. This evidence demonstrates that the officer was not driving the police vehicle at a high rate of speed and instead was driving slowly and deliberately while attempting to make an identification. Likewise, there is also no evidence to show that the officers made a "sudden veer at a[n] *** angle" to respondent's travel route, "cut[ting] off [his] roadway." Instead, the testimony from Officer Ludwich established only that the officers parked 10 or so feet in front and to the east of respondent as he was bicycling in the same direction.

¶ 149    If the record in this case showed that the officers here had "sped past" respondent, and "made a sudden veer" of the squad car, "maneuver[ing] [it] to effect an abrupt stop" of the respondent's bicycle, I would not hesitate to find that a seizure occurred. However, this is not such a case.

¶ 150    In sum, to conclude that a person is immediately "seized" when a police officer stops his vehicle 10 feet in front of that person on a public street for the purpose of inquiring of that person as a potential witness to a crime is not supported by well-settled precedent that allows the police to approach a person in public and ask questions if the person is willing to listen. See *Luedemann*, 222 Ill. 2d at 549. Because these are essentially the only factual circumstances that were revealed at the suppression hearing, and there is no evidence

showing that officer's blocked respondent's movement, I cannot agree that a seizure occurred when they initially encountered respondent.

¶ 151　　　For these reasons, and not the analysis adopted by the majority, I would affirm the circuit court's order denying respondent's motion to suppress.